430 So.2d 1167 (1983)
F & S OFFSHORE, INC. and Intervenors, INA, et al.
v.
SERVICE MACHINE & SHIPBUILDING CORPORATION, et al.
No. 82 CA 0572.
Court of Appeal of Louisiana, First Circuit.
April 5, 1983.
*1168 John T. Nesser, III and Henry A. King, Milling, Benson, Woodward, Hillyer & Pierson, New Orleans, for plaintiff and thirdparty defendant, Robert Thompson.
Robert E. Winn, Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, for third-party plaintiff, "Alco Power, Inc. (Alco)"
George M. Gilly and Winston E. Rice, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for intervenors, Insurance Co. of North America, et al.
Jacob J. Amato, Jr., Gretna, for Reinjes of Homeln/F.R. of Germany, third-party defendant.
Malcolm W. Monroe and Daniel A. Smith, Deutsch, Kerrigan & Stiles, New Orleans, for Harlan Ins. Agency, third-party defendant.
Herbert H. Duncan, Jr. and Andrew Reed, Aycock, Horne, Caldwell, Coleman & Duncan, Morgan City, Risley C. Triche, Triche, Sternfels & Nail, Napoleonville, for Service Mach. & Shipbuilding Corp.
Before COVINGTON, EDWARDS and LANIER, JJ.
LANIER, Judge.
This is a suit in contract and tort by F & S Offshore, Inc. (F & S)[1] against Service Machine & Shipbuilding Corporation (Service), Fireman's Fund Insurance Company (Fireman's), and Alco Power, Inc. (Alco) for breach of contract, breach of warranties, negligence and faulty workmanship arising out of the construction of two ocean towing vessels seeking damages totaling $1,053,500 for cost of repairs and loss of revenues. Service and Fireman's answered the petition and filed third party demands against Alco, Robert Thompson, Reintjes of Homeln/F.R. of Germany, Home Insurance Company, Harlan of Louisiana, Inc. and Captain John Trosclair. Alco answered the petition and filed a third party demand against Service seeking indemnification and/or contribution. Insurance Company of North America, St. Paul Mercury Insurance Company, Royal Indemnity Company, National Surety Corporation, Citadel Insurance Company, and Philip Alan Froude as representatives of various underwriters at Lloyd's of London intervened seeking reimbursement *1169 of $150,000 which they paid F & S for claims made under F & S's marine hull insurance policy. Prior to trial, Home Insurance Company and Reintjes of Homeln/F.R. of Germany were dismissed on motions for summary judgment.
The trial court rendered judgment in favor of Service, Fireman's and Alco and dismissed the claims of F & S and the intervenors. F & S and the intervenors took this suspensive appeal. Service, Fireman's and Alco answered the appeals to preserve their rights of indemnification and/or contribution asserted in their third party demands.

FACTS
The general facts of this case are set forth in the trial court's excellent reasons for judgment, in pertinent part, as follows:
"On April 16th, 1974, F & S entered into a contract with Service Machine wherein defendant agreed to construct two (2) one hundred and thirty-six feet (136') by thirty-four feet six inch (34'6") steel ocean towing vessels in accordance with plans and specifications for a total price of four million seven hundred fifty-one thousand six hundred and fifty-eight dollars ($4,751,658.00). The vessels referred to in this contract were later named the CAPTAIN JOHN and the CAPTAIN CRAIG and were equipped with Alco Model 251, sixteen cylinder heavy duty marine diesel engines and Reintjes Model WAB 3400 reduction gears, which were purchased by Service Machine from Alco. The total cost of the Alco supplied package was four hundred ninety-one thousand six hundred and fifty-four dollars ($491,654.00) per vessel.
"In accordance with the F & S/Service Machine contract, Service Machine furnished performance bonds in favor of plaintiff with Fireman's Fund Insurance Company serving as surety. The bonds were in the amount of two million three hundred seventy-five thousand eight hundred and twenty-nine dollars ($2,375,829.00) for each vessel and basically secured Service Machine's performance of this contract.
"The basic design of the vessels was prepared by Mr. Y.A. Mok, an independent naval architect employed by Service Machine. Representatives of F & S, Alco and the A.B.S.,[[2]] as well as Service Machine's personnel were all present during the construction of the vessels, including the vessels' sea trials and dock trials. "The CAPTAIN JOHN was delivered by Service Machine to F & S during April, 1976. On April 30th, 1976, the CAPTAIN JOHN was dispatched to the North Sea in anticipation of performing oil service related work. While en route to the North Sea, the vessel experienced lube oil consumption problems, and as a result, Mr. James Philyaw of Alco accompanied Robert Thompson of F & S to Bermuda to attend aboard the vessel. Although some loose flanges were noted in the lube oil system, no welding was required. After completion of the inspection, the vessel sailed on towards the North Sea. "Upon reaching the North Sea, the CAPTAIN JOHN was assigned the task of towing a barge owned by Brown and Root from the North Sea back to the United States. This tow got underway on May 25th, 1976, and after calls at the Ports of Brest, France and El Ferro, Spain, the flotilla began its North Atlantic passage on June 16th, ultimately bound for New Orleans. At approximately 1300 hours on the afternoon of June 17th, 1976, the vessel lost the service of the turbocharger of her starboard main propulsion plant. This required that the barge be placed under tow by the M/V MISTER CHARLIE on June 19th, whereupon the CAPTAIN JOHN set sail for Puerto Delgada, Azores for repairs. A representative of Geveke Motoren en Grondverzet (hereinafter referred to as `Geveke') travelled to the Azores to meet the CAPTAIN JOHN and effect repairs to the turbocharger, which was completed on June 24th.
"On June 28th, 1976, the CAPTAIN JOHN made rendevous with the M/V *1170 MR. CHARLIE and the Brown and Root barge and once again took the barge under tow. On July 3rd, 1976, there was further trouble with the starboard main engine, which had to be shut down. The flotilla then continued under power only of the port main propulsion plant until arrival of the M/V ROBIN V off the Bahamas on the morning of July 11th. After the ROBIN V hipped up to the CAPTAIN JOHN, the flotilla continued its voyage towards New Orleans, but on the afternoon of July 11th, off the mouth of the Mississippi River, the turbocharger of the port main engine of the CAPTAIN JOHN also failed, and the CAPTAIN JOHN and the barge both had to be towed into port. At New Orleans, the CAPTAIN JOHN was towed to the facilities of Algiers Iron Works on the right descending bank of the Mississippi River for repairs. These repairs were accomplished between July 13th and July 18th, and on July 19th the CAPTAIN JOHN once again set sail for the North Sea. The vessel arrived at Great Yarmouth, England on August 6th, 1976, and after a round trip voyage to Peterhead, Scotland, it was idle at Great Yarmouth from August 21st until September 29th. From September 29th until October 11th, it worked with the Derrick Barge SARITA in the Hewett Field.
"The CAPTAIN JOHN worked with the Barge HERCULES from October 15th until October 19th, 1976, and from October 21st until October 31st, it worked with the Elf Norge Barge MORLAND NO. 3 in the Fregg Field out of Stavanger, Norway. On November 1st, it returned to Great Yarmouth, and on November 9th, it went on drydock at Imingham, Scotland on the Humber River to allow for changing of its wheel.
"From Imingham, the vessel sailed for Stavanger on November 12th, where it took under tow the Barge B & R HM-2 for Rotterdam, and on November 20th, it arrived back in Stavanger. On November 23rd, 1976, the CAPTAIN JOHN took under tow the Barge DINO-I from Stavanger to Orkedalsoren in Norway, through the inland passage, where the flotilla arrived on November 26th. At 1300 hours on November 27th, the CAPTAIN JOHN got underway from Orkedalsoren to Stavanger, and by 1740 hours both its main engines and generator were down due to water contaminated fuel. After the port engine was restarted, it ran for approximately forty minutes before it once again stopped, and after the second stoppage, it could not be turned over again. After this second stoppage of the port main engine and inability to turn it over, the vessel returned to Stavanger, via Grindvik, on the starboard engine alone, where the contaminated fuel was pumped ashore, the fuel tanks purged and fresh fuel taken aboard. On December 6th, the vessel departed Stavanger for Rotterdam, and it arrived at DeBiesbosch Shipyard in Dordrecht on December 9th. On December 13th, the port main engine of the CAPTAIN JOHN was found to have suffered severe damage due to lack of lubrication, including a cracked crankshaft and ruined main bearings. Repairs began under the supervision of Geveke, which included repairs to both port and starboard engines and gears, construction of new foundations and reinstallation of both port and starboard engines and gears, and replacement of the lube oil piping system for both the port and starboard main engines.
"On October 26th, 1976, Service Machine delivered to F & S the CAPTAIN CRAIG. Because of the problems experienced with the CAPTAIN JOHN, a complete inspection of the CAPTAIN CRAIG was performed at Main Iron Works in Houma, Louisiana in February, 1977. Work was done on the port and starboard engines and gears, along with their foundations, as well as the lube oil piping system."[3]

*1171 THEORIES OF RECOVERY ASSERTED BY APPELLANTS

(A) LA.C.C. ART. 2315

(1) STRICT LIABILITY[4]
In Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754, 755-756 (1971), the Louisiana Supreme Court enunciated the law of strict liability for manufacturers of defective products as follows:
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.

....
"If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them."
(Emphasis added).
In Kent v. Gulf States Utilities Company, 418 So.2d 493, 498 n. 6 (La.1982), the Louisiana Supreme Court observed as follows:
"In products liability cases, the manufacturer is presumed to know the dangerous propensities of its product and is strictly liable for injuries resulting from the product's unreasonable risk of injury in normal use. The claimant nevertheless must prove that the product presented an unreasonable risk of injury in normal use (regardless of the manufacturer's knowledge), thus in effect proving the manufacturer was negligent in placing the product in commerce with (presumed) knowledge of the danger." (Underscoring added).

(2) NEGLIGENT LIABILITY
In Kent, the Louisiana Supreme Court observed that the only difference between the strict and negligent theories of recovery was the element of the defendant's scienter. See also Buchanan v. Tangipahoa Parish Police Jury, 426 So.2d 720 (La.App. 1st Cir.1983). Under the negligent liability theory, it must be shown that the defendant knew or should have known of the risk; under the strict liability theory, the claimant is relieved only of proving that the defendant knew or should have known of the risk. In either case "[T]he claimant must still prove that under the circumstances the thing presented an unreasonable risk of harm which resulted in the damage (or must prove, as some decisions have characterized this element of proof, that the thing was defective)." Kent, 418 So.2d at 497.

(B) GENERAL MARITIME LAW
Strict liability has been incorporated into the law of admiralty involving defective products. Lewis v. Timco, Inc., 697 F.2d 1252 (5th Cir.1983); Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co., 565 F.2d 1129 (9th Cir.1977). Strict liability has been applied where improper construction or defective design occurring on shore caused injury to a vessel while at sea. Moser v. Texas Trailer Corporation, 623 F.2d 1006 (5th Cir.1980); Harrison v. Flota Mercante Grancolombiana, S.A., 577 F.2d 968 (5th Cir.1978); Jig The Third Corporation v. Puritan Marine Insurance Underwriters Corporation, 519 F.2d 171 (5th Cir.1975), cert. denied, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976); Watz v. Zapata Off-Shore Company, 431 F.2d 100 (5th Cir. 1970). The circumstances giving rise to the alleged tort must have a significant relationship to traditional maritime activity as defined in Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). Whether a vessel *1172 was or was not properly designed and manufactured for safe use upon navigable waters has a substantial connection with traditional maritime activity and, therefore, the interests of admiralty overbalance those which any state might have. McCraine v. Hondo Boats, Inc., 399 So.2d 163 (La.1981).
Since a strict liability action is cognizable as a maritime tort under admiralty jurisdiction, Louisiana law must yield to federal maritime law and the substantive law of admiralty. McCraine, 399 So.2d at 163; Lister v. Texaco, Inc., 361 So.2d 290 (La. App. 1st Cir.1978), writ denied 362 So.2d 794 (La.1978). Section 402-A of the Restatement (second) of Torts is the most widely accepted expression of the theory of strict products liability and has been adopted by numerous federal courts as a part of tort case law embraced by federal maritime law. Pan-Alaska, 565 F.2d at 1135. Section 402-A(1) reads as follows:
"One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." (Emphasis added).
....
However, the general maritime law may incorporate the general law of torts when not inconsistent with the law of admiralty. Spinks v. Chevron Oil Company, 507 F.2d 216 (5th Cir.1975); Moser, 623 F.2d at 1014-1015. Even though admiralty suits are governed by federal substantive and procedural law, courts applying maritime law may adopt state law by express or implied reference or by virtue of the interstitial nature of federal law. Alco Steamship Company v. Charles Ferrant & Company, 383 F.2d 46, 50 (5th Cir. 1967), cert. denied, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968).

(C) REDHIBITION[5]
The seller of a product is bound by an implied warranty that the thing sold is free of hidden defects and is reasonably fit for its intended use. La.C.C. arts. 2474, 2475 and 2476; Rey v. Cuccia, 298 So.2d 840 (La.1974). Redhibition is the avoidance of a sale because some vice or defect in the thing sold renders it either absolutely useless or its use so inconvenient and imperfect that it is presumed that the buyer would not have purchased it had he known of the vice or defect. La.C.C. art. 2520. An essential element in a redhibition action is that the vice or defect was present in the thing at the time of the sale. Ball v. Ford Motor Company, 407 So.2d 777 (La.App. 1st Cir.1981). If the defect appears within three days following the sale, it is presumed to have existed before the sale. La.C.C. art. 2537. The manufacturer of a product is presumed to know of the defects of the thing which it manufactures. Alexander v. Burroughs Corporation, 359 So.2d 607 (La. 1978); Anselmo v. Chrysler Corporation, 414 So.2d 872 (La.App. 4th Cir.1982). If a manufacturer breaches the warranty of fitness, the purchaser of the product has a cause of action to demand the return of the purchase price and to demand all damages caused by the defect. La.C.C. art. 2545; Philippe v. Browning Arms Company, 395 So.2d 310 (La.1981).

STANDARD OF REVIEW OF FACTS
In Louisiana, appellate review in civil cases extends to both law and facts. La. Const. of 1974, art. V, § 10(B). In Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973), the Supreme Court set out the appropriate appellate standard of review of facts as follows:
"When there is evidence before the trier of fact which, upon its reasonable evaluation *1173 of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to the factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable ...."
In Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978), the Supreme Court further defined "manifest error" as follows:
"`Manifestly erroneous,' in its simplest terms, means `clearly wrong.' We said, then, that the appellate court should not disturb such a finding of fact unless it is clearly wrong. Therefore, the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous)."
In the instant case, the record is made up of testimony taken in court in the presence of the trial judge and depositions of witnesses taken out of his presence. In evaluating the testimony adduced in open court, we must follow the rules enunciated in Canter and Arceneaux because the trial judge is in a better position to evaluate the credibility of the witnesses (as compared with an appellate court's access only to a cold record). However, where a trial judge relies on the deposition of a witness, the rules of Canter and Arceneaux do not apply because the trial judge is in no better position to assess credibility than an appellate court. Farris v. Ducote, 293 So.2d 589 (La. App. 3rd Cir.1974), writ refused 295 So.2d 814 (La.1974); Abu Ali v. Guillory, 271 So.2d 882 (La.App. 4th Cir.1973). When evaluating depositions, rather than live testimony, we must determine the sufficiency and preponderance of the evidence. Blue Streak Enterprises v. Cherrie, 263 So.2d 734 (La.App. 4th Cir.1972).

DEFECTS IN THE VESSELS
Under any theory of recovery advanced, the appellants have the burden of showing that a defect or defects in the vessels for which Service was responsible caused the damages (repairs and/or loss of revenue).[6] A vessel would be defective if it were unreasonably dangerous to normal use (that it presented an unreasonable risk of harm) or if it possessed some defect in its manufacture or design which rendered it absolutely useless, or its use so inconvenient and imperfect that it would not have been purchased. In excellent reasons for judgment, the trial judge meticulously and thoroughly analyzed the extensive record in this case. This analysis, found at pages 12 through 47 of the reasons for judgment, is adopted by this court and made a part of this opinion as Appendix No. 1. We have examined the entire record and, after applying the appropriate standards for factual review, have determined that the trial judge's factual findings are correct. The appellants failed to prove that defects in the vessels for which Service was responsible caused the damages.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is correct and is affirmed at the appellants' costs.
AFFIRMED.

APPENDIX NO. 1

I. M/V CAPTAIN JOHN

A. WERE THE DEFENDANTS NEGLIGENT IN THE CONSTRUCTION OF THE FOUNDATION OF THE ENGINES AND GEARS OF THE CAPTAIN JOHN?
Plaintiff alleges that the foundations for both the starboard and port engines and the *1174 starboard and port reduction gears on the CAPTAIN JOHN had been improperly installed during the original construction. There were numerous steps taken in the actual construction of these foundations, and numerous component parts that are integrated to form the entire foundation. The Court will limit its inquiry to those particular steps taken and integral parts used by the defendants which were specifically complained of by plaintiff in its briefs and at trial.
Plaintiff complains of Service Machine's use of resin chocks rather than machined steel chocks as a means of filling the void between the engine and the vessel's structural foundation. The contractual documents between plaintiff and defendant were silent as to the type of chocks to be used, so Service Machine opted for the use of resin chocks. These resin chocks were approved by the Alco drawings for use with its engines, and is in fact faster and less expensive to use as compared to steel chocks (Tr.Vol. II, p. 404). Service Machine used a type of resin chock known as Chockfast, produced by the Philadelphia Resins Corporation. Chockfast is a two-component epoxy resin system which has comparitively low viscosity in its liquid form. It is supplied premeasured. Due to the critical nature of the mixing ratio of the resin to harden, the resin is supplied in slack filled containers along with the appropriate amount of hardener. The two are mixed together in the resin can, and then thirty minutes to an hour and a half after mixing they become solid (Tr.Vol. VI, p. 227).
The most qualified person who testified regarding the use of poured resin chocking was John Murray Wilson, an expert in the field of marine engineering in the area of Philadelphia Resin and Chockfast for marine foundations. Mr. Wilson testified that the principal use of Chockfast is as a chocking material for marine propulsion machinery; it is used in virtually every maritime nation in the world; and roughly twenty percent of the ships at sea are on Chockfast resin chocks. In fact, Chockfast is generally used in the shipyards in the Gulf Coast area, including Avondale, Harvey Quick Repair Yard, Equitable, Golinger, Quality Machine Algiers, Main Iron Works, Bethlehem Steel, Livingston, Pascagoula and Ingals (All Navy ships built at Ingals have Chockfast installed in them) (Tr.Vol. VI, pp. 227-228).
The Court feels that the evidence is abundantly clear that the use of Chockfast as a chocking material was proper and in accordance with accepted maritime standards, as exemplified by its widespread use in the maritime industry. The record reflects that its use by Service Machine in the CAPTAIN JOHN was accepted and approved not only by Service Machine, but also by Alco, A.B.S. and the plaintiff itself (Tr.Vol. II, pp. 401, 407). Mr. Wilson even testified that he has never experienced any failures with Chockfast in its use on marine vessels, and that the use of Chockfast is actually preferred over steel chocks for rough-running engines, due to its higher coefficient of friction against the engine bed (Tr.Vol. VI, pp. 242-244).
The resin foundation of the CAPTAIN JOHN was in fact replaced with steel chocks while the vessel was at DeBiesbosch Shipyard. This was done at the request of a representative of Alco, Mr. Laurence Crawford, and a representative of A.B.S., Mr. Peter DeBie. A careful examination of the depositions of these two gentlemen indicate that their decision to replace the Chockfast with steel was based on preference and familiarity with the use of steel chocks rather than the allegedly defective nature of the Chockfast (Deposition of Peter DeBie, p. 18; deposition of Laurence Crawford, pp. 39-40). Even if steel chocks would have in fact been a better chocking method (which is questionable in light of Mr. Wilson's testimony), this fact alone would not constitute negligence on the part of the defendants. As long as Chockfast was strong enough to serve as a proper engine and gear foundation, then its use was proper and in no way can be considered a defect or deficiency in and of itself. In light of this evidence, the Court finds that there was no negligence in defendant's choice of Chockfast over steel chocks for *1175 the construction of the foundations for the CAPTAIN JOHN.
There still lies the possibility, as pursued by the plaintiff, that Service Machine was negligent in the actual application, or pouring, of the Chockfast. The most notable objection urged by plaintiff is that the Chockfast was poured too thin, and thus not strong enough to support the weight of the engines and gears. Mr. A.C. McCutcheon, who was hired by F & S to oversee the port engine repairs of the CAPTAIN JOHN in Holland, testified that upon examination of the foundations, he noticed that the Chockfast varied in thickness from the inboard to the outboard side of the vessel (Tr.Vol. III, p. 533). Mr. Peter DeBie, the A.B.S. European inspector, also visited the CAPTAIN JOHN in Holland during repairs and recommended that the Chockfast be replaced with steel chocks. Mr. DeBie, based on information obtained from Geveke, determined that the extreme weight of the engines was exerting too much pressure on the resin foundations, necessitating its replacement with stronger steel chocks (Deposition of Peter DeBie, pp. 45-46).
The drawings supplied by Alco for installation of their engines are silent as to the maximum thickness recommended for the Chockfast, but it does recommend a minimum depth of one-half (½) inch (Tr.Vol. IV, p. 903; Tr. Vol. V, p. 1062). However, the expert witness in the field of resin chocking, Mr. Murray Wilson, testified that the thickness of the Chockfast has nothing to do with its strength, and even the application of only a quarter of an inch of Chockfast would have been sufficient to withstand the compressive strength of the engines of the CAPTAIN JOHN (Tr.Vol. VI, p. 237).
Even if the Court assumes that the resin chocks should have been poured to a depth of at least one-half inch, there is no conclusive evidence that it was not actually done so. Mr. McCutcheon testified that the resin only varied in thickness, and this determination was made only after the Chockfast had been actually removed by the DeBiesboch Shipyard from its original location on the vessel's structure. Mr. DeBie's belief that the Chockfast was too weak to withstand the pressure from the engines is questionable also. Mr. DeBie stated that he based his determination of the weakness of the Chockfast upon information supplied him by Geveke. However, his final report to the A.B.S. on the damages and repairs of the CAPTAIN JOHN is silent as to any actual measurements or calculations made regarding the strength of the resin, nor does it reflect any figures indicating the weight of the engines, total surface area of the resin, or the distribution of the resin (Deposition of Peter DeBie, pp. 45-46). Mr. DeBie even stated in his deposition that the resin appeared to be normal in thickness not too thin and not extremely thick. In fact, Mr. DeBie estimated that it was at least an inch in thickness (Deposition of Peter DeBie, pp. 36-37). The Court also points out that Mr. DeBie, by his own admission, stated that he was not informed by Geveke of any relationship between the thickness and the strength of the resin; that he himself was not a specialist in the field of resin chocking; and that he had limited experience with the use of resin, and then with boats completely different than the CAPTAIN JOHN (Deposition of Peter DeBie, pp. 39, 41, 52-53).
The use of resin chocking for the foundations on the CAPTAIN JOHN was known to the owner, the shipyard., the shipyard's naval architect, Y.A. Mok, and to the A.B.S., and its use was approved by Alco for its engines. Other than Mr. Robert Thompson's unspecified reservations about its use, no one objected to the use of the resin or its application by Service Machine. The CAPTAIN JOHN passed all sea trials and dock trials with the use of this resin foundation, with no problems noted. F & S' own representative, Mr. Sam Smith, who visited the CAPTAIN JOHN and inspected its foundations while at the shipyard in Holland, reported to Julian Fernandez, Chairman of the Board of Service Machine, that he saw nothing wrong with the foundations. Mr. Smith reported that after striking the Chockfast with a hammer, he made no indentation on it and found nothing *1176 loose or wrong with the foundation (Tr.Vol. V, p. 1134).
In light of this evidence, the Court finds that Service Machine was not negligent in the application of the resin chocking, and that such chocking was capable of performing the purpose of its intended use.
Another complaint made by F & S was the lack of body-bound bolts and collision chocks on the engines and gears of the CAPTAIN JOHN. With body-bound bolts, a hole is reamed in the steel and a bolt is specially machined so as to fit solidly in the hole without any slack. The purpose of this bolt is to assure the stability of the engine and gears as attached to the foundation, so as to keep them immobile and aligned during the operation of the vessel. Collision chocks serve this same purpose, and are considered an extra precautionary safety measure designed to prevent the engine from shifting (Deposition of Douglas Kirk, pp. 51-52). Collision chocks may be achieved by using steel longitudinal chocks running alongside the fore end of an engine, or by allowing the resin, or Chockfast, to rise up on the side of the engine foot itself (Deposition of Douglas Kirk, p. 50).
According to the drawings supplied by Alco and Reintjes (gear manufacturer), body-bound bolts were required on the aft, or drive end, of the engine and on the gearbox (Tr.Vol. II, p. 61; Tr.Vol. V, p. 1068). Mr. A.C. McCutcheon testified that there were no such body-bound bolts at the drive end of both starboard and port engines when he examined the CAPTAIN JOHN in Holland during its repairs (Tr.Vol. III, p. 569). Henk DeRidder, Field Service Supervisor for Geveke, stated in his deposition that he saw no body-bound bolts on the engines or gears of the CAPTAIN JOHN at the time he inspected the vessel in Holland (Deposition of Henk DeRidder, pp. 48-49). Mr. Robert Thompson also at one point testified as to the absence of body-bound bolts on the engines of the CAPTAIN JOHN upon his inspection of the vessel in Holland (Tr.Vol. II, p. 462). However, Mr. Thompson later testified that he had only examined the starboard engine for body-bound bolts and found only that some of the bolts were not fitted (Tr.Vol. II, pp. 260, 493).
The Court points out that plaintiff has failed to produce any evidence that bodybound bolts were not present on the drive end of the engines or the gearboxes at the time of the delivery of the CAPTAIN JOHN to F & S. All testimony given regarding the absence of body-bound bolts where required came from witnesses who made their observations subsequent to the seizure of the port engine and during the vessel's repairs in Holland.
On the other hand, the defendants have produced in the Court's opinion convincing evidence that Service Machine actually installed body-bound bolts on the drive end of the engines and also on the gearboxes. Mr. Jim Dumas, once an employee of Service Machine who performed the engine and gear installation on the CAPTAIN JOHN, testified in detail as to the procedure he used in placing body-bound bolts on the engines and gears. Mr. Dumas testified that a gear representative inspected every step in the process of fitting the bolts for the gearboxes, from the time the holes were reamed in the steel to the time the machined bolts were actually placed in the hole. In fact, Mr. Dumas stated that the gear representatives actually used a four pound hammer to check the sufficiency of the body-bound bolts (Tr.Vol. VI, pp. 54-59). This procedure was also followed during the placing of the body-bound bolts for the engines. According to Mr. Dumas, an Alco representative was present to personally approve the installation of the bodybound bolts. Mr. Dumas testified that two body-bound bolts were placed on each side of the engine on the drive end, and were driven into place with the use of a power jackhammer (Tr.Vol. VI, pp. 65-67).
In addition to the testimony of Mr. Dumas, the Court examined the deposition of Mr. Perry Gisclair, a representative of Karl Senner, Incorporated, the supplier of the gears for the CAPTAIN JOHN. Mr. Gisclair inspected the gears during construction and specifically remembers seeing *1177 body-bound bolts installed on the CAPTAIN JOHN (Deposition of Perry Gisclair, p. 61).
As to the collision chocks, plaintiff put forward evidence to indicate that steel longitudinal chocks were not installed on the front end of the engines, as recommended by the Alco drawings (Tr.Vol. V, p. 1068). This evidence was again composed of the testimony and depositions of witnesses who examined the CAPTAIN JOHN while at the Holland shipyard subsequent to its port engine seizure (Deposition of Laurence Crawford, p. 37; Tr.Vol. II, p. 460). Unlike the body-bound bolts, defendants were not able to convince the Court that these collision chocks were actually installed on the CAPTAIN JOHN during its construction. Mr. Perry Gisclair, a representative of Karl Senner, Incorporated who examined the gear installation during the construction of the CAPTAIN JOHN, stated in his deposition that the steel longitudinal chocks were installed (Deposition of Perry Gisclair, pp. 65-66). However, Mr. Gisclair bases his statement not on a physical observation, but instead on his failure to note the absence of such collision chocks in his initial report to his home office during the construction of the CAPTAIN JOHN. Furthermore, Mr. Jim Dumas, who helped install the engines and gears in the CAPTAIN JOHN, could not recall if any collision chocks were installed.
The Court notes that the only place collision chocks were recommended was for the front end of the engines. Howell Cargile, a representative of Alco, stated in his deposition that Alco only recommends the use of collision chocks on the front end of the engines to keep them from moving sideways. These chocks are not recommended on the drive end of the engine because the body-bound bolts keep that end from moving (Deposition of Howell Cargile, p. 18). Mr. Hector Pazos, who qualified as an expert in naval architecture and marine engineering, testified that after thirty years experience in designing vessels for the United States Navy and merchant fleets, he saw no reason to place collision chocks on the gears where body-bound bolts already existed. In fact, Mr. Pazos strongly disfavored their application due to the thermal stresses such chocks place on the gear casings (Tr.Vol. V, pp. 1232-1234).
The Court is convinced that collision chocks were recommended to be placed on the front end of the engines on the CAPTAIN JOHN, and that such chocks were not installed by Service Machine. However, the Court feels that these collision chocks were just an extra precautionary measure, in addition to the body-bound bolts, to assure that the engines were stable on their foundations (Deposition of Douglas Kirk, pp. 51-52). The body-bound bolts were the primary safeguard in keeping the engines and gears stable. The failure to place collision chocks by Service Machine only proves that Service Machine did not take every possible step to assure the stability; but by installing body-bound bolts, it took, in the Court's opinion, sufficient steps to secure the engine and gears to their foundations. Representatives of the gear and engine manufacturers personally approved the installation of the body-bound bolts on the CAPTAIN JOHN, without any objections. In addition, a representative of A.B.S. made continuous, ongoing inspections of the CAPTAIN JOHN during the entire eight months of its construction, and no complaint was made regarding these body-bound bolts or the absence of the collision chocks. Furthermore, the CAPTAIN JOHN successfully completed its dock trials and sea trials, which included crash reversal tests. Thus, the Court finds that Service Machine was not negligent in its steps to secure the engines and gears to the foundations of the vessel.
Another complaint regarding the engines and gear foundations of the CAPTAIN JOHN was that the engines were resting on jacking screws rather than on the Chockfast itself. Jacking screws are used to elevate the engine off of its foundation in order to seek the proper alignment between the engine and the gear. These screws are screwed down through the engine feet and actually raise the engine off of the foundation (Tr.Vol. I, p. 81). Once the engine is *1178 aligned, it is a general practice to back these jacking screws down, but not necessarily remove them, so as to allow the engine to rest firmly on the Chockfast (Tr. Vol. IV, p. 905; Deposition of Belden Domangue, p. 44).
Two men who examined the CAPTAIN JOHN while at the Holland shipyard, Robert Thompson and A.C. McCutcheon, both testified that in their opinion these jacking screws were not backed out, and that the engines were actually riding on these screws rather than on the Chockfast (Tr. Vol. 1, pp. 75, 81; Tr. Vol. III, p. 569). Mr. Thompson testified that it was obvious that the weight of the engine had been riding on the jacking screws because the bottoms of the screws had been flattened and polished (Tr.Vol. I, pp. 75, 81).
On the other hand, Mr. Jim Dumas testified that he specifically remembered backing the jacking screws off far enough so as to not be touching the engine. This was a normal procedure followed by Mr. Dumas on every vessel he constructed (Tr.Vol. VI, p. 83). In addition, Mr. Hector Pazos stated in his deposition that these jacking screws could very well have been backed out as Mr. Dumas testified to and still be flattened and polished according to Mr. Thompson's description of these screws (Deposition of Hector Pazos, p. 120). Mr. Pazos further stated that in his opinion he felt it was impossible for an inspector or surveyor examining the CAPTAIN JOHN after its port engine seizure to determine whether or not the engine was actually riding on its jacking screws (Deposition of Hector Pazos, p. 112).
The Court feels that plaintiff has failed to prove by a preponderance of the evidence that Service Machine delivered the CAPTAIN JOHN with its engines resting on its jacking screws. Mr. Dumas testified that he did in fact release the screws, and no objection otherwise was made during the construction of the vessel. Even if these screws were left to carry the weight of the engines, the Court is not satisfied that this in itself would constitute negligence on the part of Service Machine. Mr. Pazos, as an expert in naval architecture and marine engineering, stated in his deposition and at trial that there is nothing wrong with having the engine weight resting on the jacking screws. In fact, Mr. Pazos testified that to do so would give the jacking screws the same effect as a steel machined chocksit becomes part of the entire foundation (Deposition of Hector Pazos, p. 108; Tr.Vol. VI, p. 453). In light of the fact that plaintiff so vigorously argued for the use of steel machined chocks instead of the Chockfast actually used for the foundations, the Court feels that plaintiff should have no complaint concerning the installation of these jacking screws. Accordingly, the Court finds no negligence on the part of Service Machine with respect to the jacking screws on the CAPTAIN JOHN.
Another alleged defect pointed out by plaintiff in the foundations of the CAPTAIN JOHN was the buckling of two filler plates, one placed above the engine girder and the other under the Chockfast for the gears. The buckling of these filler plates was noticed during the repairs of the CAPTAIN JOHN in Holland in January of 1977 (Tr.Vol. I, p. 95; Tr.Vol. II, pp. 410, 539). These filler plates had not been welded all around, but instead had only been partially welded (Tr.Vol. III, p. 678). Jan Keesmaat, a surveyor who examined the gears of the CAPTAIN JOHN and their foundations while the vessel was in Holland, stated in his deposition that due to the impartial welding, the plate under the gears had buckled, causing the gears to float and become damaged (Deposition of Jan Keesmaat, pp. 35, 65).
The question of negligence on the part of Service Machine as to these filler plates centers on if in fact these plates were installed improperly. Plaintiff pointed out during the trial that both plates had not been completely welded all around, which caused the plates to float and possibly cause damage to the gears and engines. However, the Court feels that it was not incumbent upon Service Machine to weld the plate in every possible place, so long as the welds actually placed were sufficient to *1179 keep the filler plates intact. The testimony of Mr. Hector Pazos at trial on this point supports this opinion. Larger short welds withstand the same amount of stress as small continuous welds (Tr.Vol. VII, p. 456). As long as the welds actually placed did not crack or separate from its original position, then the welds served their purpose. In fact, Jan Keesmaat stated in his deposition that he saw no fractures or cracks on any of the welds he examined on these filler plates (Deposition of Jan Keesmaat, p. 73). Mr. Pazos stated that the fact that these welds were not broken means that the weld was structurally sound and of the proper size. These welds are designed to transmit the compressive forces applied to these filler plates; if the welds were not fractured, then they were within the capacity of transmitting these compressive forces (Tr.Vol. VII, pp. 456, 459). Thus, the Court finds no negligence on the part of Service Machine in installing these filler plates. The fact that one such plate under the gears had buckled does not convince the Court of any negligence on the part of Service Machine during the construction of the vessel itself. This buckling may have been caused by factors totally beyond the control of the defendant, as will be discussed later in this opinion.
In addition to all the other complaints regarding the foundations and gears of the CAPTAIN JOHN, plaintiff alleges that the structural girders and brackets of the CAPTAIN JOHN had been cut out to such an extent that the structural integrity of the ship had been severely weakened. Again plaintiff bases its complaints on the reports of those people examining the CAPTAIN JOHN while in Holland in January of 1977 (Deposition of Jan Keesmaat, pp. 37-39; Tr.Vol. II, pp. 420, 534-536). Mr. Laurence Crawford stated that in his opinion the foundations were so weakened by the cut outs that the gearbox actually carried the foundation and not vice-versa (Deposition of Laurence Crawford, p. 81).
The Court is convinced that certain cut outs in the structural foundation of the CAPTAIN JOHN were made. Mr. Steve Larcade testified that it was not uncommon for these cut outs to be made in the structural foundation of the vessel in order to properly install the engines and gears, although he personally did not see any such cut outs on the CAPTAIN JOHN (Tr.Vol. VI, pp. 168, 173-174). However, the Court is not convinced that such cut outs constituted negligence on the part of Service Machine in that they resulted in weakening of the structural integrity of the foundations of the vessel. Certainly anytime one cuts a section out of a steel foundation of a ship, it weakens that foundation to some extent, such that the foundation is not as strong as it could possibly be. But the foundation may still be strong enough to adequately support the engine and gears and thus serve its intended purpose. The Court feels that plaintiff did not prove by a preponderance of the evidence that these cut outs actually weakened the foundations of the vessel, rendering it incapable of supporting the engine and gears of the vessel. The Court again points out that despite the presence of representatives of the plaintiff, Alco and the A.B.S. during the construction of the CAPTAIN JOHN, no complaint was made regarding these cut outs. Plaintiff's own representative, Mr. Robert Thompson, testified at trial that despite all the work and inspections made on the CAPTAIN JOHN in Holland, it was never determined that these cut outs had any adverse effect on the vessel (Tr.Vol. II, p. 420). Furthermore, Mr. Steve Larcade testified that he witnessed the installation of additional brackets on the foundations of the CAPTAIN JOHN not required by any drawing so as to reinforce and strengthen these foundations (Tr.Vol. VI, pp. 167-168).

B. WERE THE DEFENDANTS NEGLIGENT IN THE CONSTRUCTION OF THE LUBE OIL PIPING SYSTEM ON THE M/V CAPTAIN JOHN?
Plaintiff contends that the massive failure of the port engine had been caused by the lack of lube oil and lube oil pressure in the system. More specifically, Mr. Laurence Crawford termed the lube oil piping on the CAPTAIN JOHN as the dirtiest he *1180 had ever seen. Mr. Crawford stated that no attempt had been made by Service Machine to clean the pipe at all (Deposition of Laurence Crawford, pp. 21-23). In addition to the filthy piping, plaintiff alleges that the pressure relief valve and pressure control valve in the lube oil system were interchanged on their installation (Deposition of Laurence Crawford, p. 25). This faulty valve installation, combined with the filthy piping, allegedly created severe drops in the lube oil pressure maintained in the engines, which ultimately caused or contributed to the failure of the port engine and considerable damage to the starboard engine (Deposition of Henk DeRidder, pp. 21-25).
In regards to the interchanged pressure relief valve and pressure control valve, the Court is convinced that these valves were in fact interchanged at the time the CAPTAIN JOHN underwent repairs in Holland in January of 1977. Mr. Laurence Crawford and Mr. Adrianus Van Den Berg, who both examined the CAPTAIN JOHN in Holland, stated in their depositions that not only were these valves located in the wrong sequence, but were adjusted at improper pressure settings (Deposition of Adrianus Van Den Berg, pp. 53-57; Deposition of Laurence Crawford, pp. 26-27). The result of this was that the lube oil would be dumped into the sump tank of the engine, preventing it from being filtered or serving any lubricating function to the engine at all (Deposition of Adrianus Van Den Berg, pp. 55, 57-58).
Whereas the evidence is abundantly clear that these valves were interchanged and functioning improperly at the time the CAPTAIN JOHN underwent repairs in Holland, the Court also finds the evidence to be abundantly clear that such negligence was not attributable to Service Machine or any of the defendants. Mr. Carl Elsner, a representative of Alco who supplied Service Machine with the valves in question, stated in his deposition that there need be no test made to assure that the valves were installed in proper sequence as long as the pressure gauges of the engines reflected the proper pressure while the engines were running. If these valves were in fact interchanged and/or adjusted improperly, these gauges would accordingly reflect inadequate lube oil pressure (Deposition of Carl Elsner, p. 58). Mr. Van Den Berg also stated in his deposition that the instrument panel of the engine would indicate if the lube oil pressure was inadequate while the engines were running (Deposition of Adrianus Van Den Berg, p. 69). Yet the evidence indicates that the lube oil pressure of the CAPTAIN JOHN was normal even up to the day of the port engine seizure. Julian Fernandez stated that the valves, the pressure settings, and the location of the valves were all fully functional and tested and accepted during the sea trials by the A.B.S., F & S and Alco and everybody concerned (Deposition of Julian Fernandez, p. 57). Robert Thompson and Jim Philyaw had occasion to check the entire lube oil piping system in Bermuda in May of 1976. Both stated that despite some minor leaks in the flanges, everything was in proper working order and that the pressure readings were normal (Tr.Vol. I, pp. 58-59; Deposition of Jim Philyaw, p. 60). In fact, John Trosclair, the Captain on board the CAPTAIN JOHN the day of its port engine seizure, testified that just a couple of hours prior to the seizure he and the oiler of the vessel checked the lube oil pressure readings and found them to be normal (Tr.Vol. V, pp. 1042-1043).
The Court is convinced that if Service Machine or Alco were negligent in the installation of these valves in the lube oil piping system, such negligence would have manifested itself through the pressure readings and would have been discovered at an earlier date. Instead, the lube oil pressure was found to be normal not only at the sea trials but also at other times during the operation of the CAPTAIN JOHN. Moreover, the Court takes notice of certain evidence indicating that these valves and their pressure settings were actually tampered with at some point during the operation of the CAPTAIN JOHN. Mr. Crawford stated that he discovered in Holland that the spring loading screw had actually been screwed tighter than required in an effort *1181 to increase the lube oil pressure (Deposition of Laurence Crawford, pp. 26-28, 98). Mr. Henk DeRidder, who examined these valves in Holland together with Mr. Crawford, stated that the caps on the valves had been taken off and the locking rings were backed off. Mr. DeRidder went on to say that upon the original installation of the valves, these caps should have been on and the locking rings in place. In fact, these locking rings are actually soldered on after the correct pressure setting is reached during installation (Deposition of Henk DeRidder, pp. 111-113). Since no objection was made concerning the installation of these valves or their pressure settings during the construction of the CAPTAIN JOHN or at the dock and sea trials, the Court can only conclude that any tampering with these valves occurred after the delivery of the CAPTAIN JOHN to the plaintiff.
As to the condition of the lube oil piping itself, the Court finds that it was the duty of Service Machine to have the pipe cleaned before its installation. Mr. Crawford stated in his deposition, as noted earlier, that no attempt had been made by Service Machine to actually clean the pipe. Once again the Court points out that all the evidence presented by plaintiff regarding the condition of the lube oil piping consisted of the testimony of those who examined the lube oil piping only after the CAPTAIN JOHN experienced the seizure in December of 1976.
The Court finds that the evidence clearly establishes that the shipyard, Service Machine, did send the lube oil piping out to be cleaned by an independent contractor, and in fact, the invoice from that independent contractor was admitted into evidence (Tr. Vol. VI, pp. 113-116,124,159-162, 271-272). Both Jim Dumas and Steve Larcade testified that they examined the pipe after it was returned from the independent contractor and found the pipe to be sufficiently clean (Tr.Vol. VI, pp. 90, 116, 159). In addition, sockets welds were used by Service Machine in the installation of the lube oil piping to prevent any welding matter from entering the system (Deposition of Belden Domangue, p. 29).
The Court is not questioning the fact that certain contaminants were found in the lube oil piping upon inspection of the CAPTAIN JOHN in Holland in January of 1977. However, the Court finds that plaintiff has failed to prove by a preponderance of the evidence that such contaminants were a result of the negligence of Service Machine in the installation of the lube oil piping system, or that such contaminants actually caused the damage experienced by the CAPTAIN JOHN. Mr. Van Den Berg stated that he did not find any loose metal particles in the lube oil piping, but did find some attached to the walls of the piping (Deposition of Adrianus Van Den Berg, p. 79). Mr. Belden Domangue testified that he found no metal or welding slag in the strainers or filters in the lube oil system of the CAPTAIN JOHN. However, Fritz Hillgenboecker, a marine surveyor who also examined the CAPTAIN JOHN in Holland, testified that he did find small metal particles in the lube oil strainers of the vessel, but in his opinion were not of sufficient quantity to interfere with the operation of these strainers (Tr.Vol.III, p. 720). Furthermore, the Court feels that the filtering system installed in the lube oil piping was sufficient to catch any debris in the system. However, there is evidence, as will be discussed later in this opinion, that these filters and strainers were not properly maintained by F & S. This, along with the probability as previously discussed that the pressure relief and pressure control valves were tampered with after delivery of the CAPTAIN JOHN, would have effectively eliminated the oil filtering system on the vessel. Certainly this negligence and any resulting damage cannot be attributed to the defendants.
The Court can only conclude that Service Machine sufficiently discharged its duty to have the lube oil piping cleaned before installation. Not only was the pipe cleaned, but other measures were taken in the installation of the pipe so as to lessen the possibility of contaminants entering the system. Obviously Robert Thompson, the representative of F & S during construction of *1182 the CAPTAIN JOHN, and the A.B.S. representative were also satisfied that the lube oil piping had been properly cleaned or Mr. Thompson would not have accepted the CAPTAIN JOHN for F & S and A.B.S. would not have certified the vessel. As to the entire lube oil piping system, it must be remembered that it was plaintiff's burden to prove not only that the lube oil system was dirty and the valves were interchanged on the CAPTAIN JOHN in December, 1976 or January, 1977, but that such conditions existed at the time of the delivery of the vessel in April, 1976 and that such conditions were in some way attributable to the actions of the defendants. The Court finds that the plaintiff completely failed to make such a showing.
At this point the Court would like to address itself to the evidence presented by the defendants regarding the possible causes of the damages experienced by the CAPTAIN JOHN. Defendants argue, and the Court is in agreement, that the damages of the vessel were most probably caused by factors totally out of the control and the ambit of duty of the defendants.
There was evidence presented by the defendants regarding the inadequate crewing of the CAPTAIN JOHN once it was placed into operation by the plaintiff. Plaintiff's representative, Robert Thompson, testified that because the engines on the CAPTAIN JOHN were large and complicated it should never sail without an engineer (Tr.Vol. II, p. 307). Hector Pazos, a maritime engineer who qualified as an expert, also testified that if the vessel is designed to have an engineer permanently aboard, it should not sail without one, otherwise there would be no way to control any imperfections in the operation of the vessel (Tr.Vol. VII, p. 474). Nonetheless, when the CAPTAIN JOHN left Stavanger, Norway on November 15, 1976 for Rotterdam, it left without an engineer. In fact, there was no engineer aboard the CAPTAIN JOHN on November 27th, 1976, the day its port engine seized (Tr.Vol. II, pp. 316-317; Tr.Vol. IV, p. 971; Tr.Vol. V, pp. 1136-1137).
Mr. Carl Elsner, a representative of Alco, testified as to the importance of the crew following the engine maintenance schedule furnished to F & S by Alco in order to obtain reliable service from the Alco engines (Tr.Vol. VIII, pp. 8-9). However, there was much evidence indicating that the crew of the CAPTAIN JOHN failed to provide even routine maintenance to the vessel, or did so in an incompetent manner. Deck and engine logs either were not kept or were sketchy and haphazard at best. Beverly Bergeron, a diesel mechanic of thirty years who was engaged by the plaintiff to do repair work on the CAPTAIN JOHN at the Algiers Shipyard, testified that he found the oil filters of the engines were breaking up and clogging the lube oil strainers. It was Mr. Bergeron's opinion that these cardboard filters had either been improperly installed by the crew and/or left in place too long without being changed, effectively eliminating the oil filtering system on the vessel (Tr.Vol. V, pp. 1190-1214).
The testimony of the findings of Mr. Bergeron is consistent with the description of the operation of the lubricating oil strainers and filters described in deposition by the temporary engineer on the CAPTAIN JOHN, Peter Weston. Mr. Weston stated that during one period of duty he cleaned these strainers about one hundred times and consistently found lint in them. Mr. Weston also stated that the vessel was experiencing a loss of oil pressure during this same period (Deposition of Peter Weston, pp. 26-27). Mr. Douglas Kirk also witnessed lint in the strainers, and stated that once the strainers were cleaned, the oil pressure of the vessel returned to normal (Deposition of Douglas Kirk, pp. 148-150). Mr. Hector Pazos testified that it was his opinion as an expert that this clogging of the lubricating oil strainers in the manner described by Peter Weston, and the improper installation of the filters, as described by Mr. Bergeron, would cause a loss of oil pressure, causing the engine to lose its lubricating wedge, and resulting in damage to the turbochargers and the engines (Tr.Vol. VII, pp. 445-449).
*1183 The Court points out that the CAPTAIN JOHN was equipped with an alarm panel designed to alert the captain and engineer of various problems the vessel might incur during its operation, such as low oil pressure, to facilitate quick remedial action by the crew. Mr. Robert Thompson testified that he personally witnessed the installation of this alarm system on the CAPTAIN JOHN (Tr.Vol. II, p. 227). Such an alarm system would certainly have alerted the crew that the CAPTAIN JOHN was experiencing dangerously low oil pressure, such as that witnessed by Mr. Weston, so as to allow them to take corrective measures before any serious damage to the vessel occurred. However, it seems that the alarm system was disconnected after delivery of the CAPTAIN JOHN to F & S, despite its requirement by the A.B.S. (Deposition of Peter DeBie, p. 82). Both Mr. Peter DeBie and Mr. Adrianus Van Den Berg stated in their depositions that this alarm system on the CAPTAIN JOHN was disconnected upon their examination of the vessel after the port engine seizure in December of 1976 (Deposition of Peter DeBie, p. 82; Deposition of Adrianus Van Den Berg, pp. 83-90).
It seems that other crew members of the CAPTAIN JOHN were not as diligent as Peter Weston in checking and cleaning the lube oil strainers and filters. Mr. Douglas Kirk, an Alco representative who visited the CAPTAIN JOHN while at the Algiers Iron Works in July of 1976, stated in his deposition that he informed the engineer of the vessel that in order to keep the oil pressure at an adequate level it was necessary to keep the strainers clean. In fact, Mr. Kirk himself inspected the strainers at that time and found them to be clogged up and dirty. When Mr. Kirk inquired of the engineer if he had attempted to determine the cause of the low oil pressure which the CAPTAIN JOHN was experiencing at that time, the engineer replied "No, the engine's in warranty. Why should I mess with it?" (Deposition of Douglas Kirk, pp. 148-149). This lack of maintenance is further documented by the report of the Geveke representative, Mr. Henk DeRidder, who was aboard the CAPTAIN JOHN on November 18th and 19th, 1976, less than a week before the seizure of the port engine. His November 18th report states:
"Request the captain to give permission to stop engines, clean lube oil strainers of both engines; got the same stupid answer, namely, that he, the captain, had nothing to do at all with the engines and he only followed orders of the contractors and these were `sail'; also, if the engine should fly into pieces around his ears and the next time when a fire should break out again, he should wait sitting on the tug until the whole affair, including the Alcoes, should sink ... (Tr.Vol. II, p. 326)".
Mr. DeRidder's November 19th report stated:
"... further, asked him (Les Lelean) to give us some time to be able to instruct personnel on ship so that at least somebody knows what is the purpose of lube oil strainers and that this has to be cleaned periodically (Tr.Vol. II, p. 330)".
Another recurring problem experienced by the CAPTAIN JOHN during its operation was contaminated fuel. Captain John Trosclair testified that he was asked to return from his vacation early in order to meet the CAPTAIN JOHN in Norway in November of 1976 because of problems the vessel was having with water in its fuel. Mr. Trosclair stated that once aboard the vessel he confirmed that contaminated fuel was in fact the cause of the problems of the CAPTAIN JOHN (Tr.Vol. V, p. 1044). This problem of water in the fuel oil was not a new one on the CAPTAIN JOHN. According to Captain Trosclair, there had been a problem of such water in the fuel back in August of 1976 (Tr.Vol. V, p. 1033). The problem was again noted in the log book of the vessel on October 21st, 1976, in which it states "... five hundred thirty hours, port generator shut down. Water in the F. oil" (Tr.Vol. V, p. 1022). Mr. Henk DeRidder, the Geveke representative, also noted water in the fuel of the CAPTAIN JOHN. His November 19th, 1976 report stated:
"Probably had more water than fuel in the tank. Request him (Les LeLean) to *1184 give us a purchase order so we could supply thirty-two fuel pumps, plus thirtytwo new injectors to revive both engines..." (Tr.Vol. II, p. 330).
F & S representative/inspector, Mr. Robert Thompson, conceded at trial that water in the fuel oil makes the engine run rough and causes the fuel injectors to go out. In fact, at one point during the operation of the CAPTAIN JOHN all four engines, two propulsion engines and two generator engines, shut down at the same time because of contaminated fuel (Tr.Vol. IV, p. 981). Mr. Thompson further conceded that he would assume that a sufficient amount of water in the fuel oil could cause a seizure of the engine (Tr.Vol. II, pp. 357-358, 382-383). According to Captain Trosclair the problem with water in the fuel in his opinion was so bad as to actually cause the seizure of the port engine of the CAPTAIN JOHN on November 27th, 1976 (Tr.Vol. V, p. 1023).
The Court places particular emphasis on the testimony of Hector Pazos concerning the damage water in fuel can cause in a vessel. Mr. Pazos, an expert in marine engineering, testified that water in the fuel could cause excessive vibrations of the engines due to misfiring of the pistons as well as having a detrimental effect on the lubrication of the cylinders and piston rings of the engine. The type of seizure which occurred in the port engine of the CAPTAIN JOHN results when the pistons, due to the heat and lack of lubrication, comes metalto-metal in contact with the cylinder, as they move up and down, causing them to stick together. When asked if excessive water in the fuel is a common cause of such a seizure, Mr. Pazos answered in the affirmative (Tr.Vol. VII, pp. 444, 501-502).
In addition to the inadequate crewing and maintenance and contaminated fuel, the CAPTAIN JOHN was also plagued with several collisions during its operation which caused it serious damage. The pilot house log for the CAPTAIN JOHN contains a notation by Captain Tom Ichner for 1225 hours, October 18th, 1976, which states:
"When pulling away from the barge, port wheel hit underwater object, vibration in port wheel; also notified Barge Hercules at this time about damage" (Pilot House Log, October 18, 1976, Plaintiff Exhibit 20A).
Captain Trosclair, who came aboard the vessel after this incident, did testify at trial that there were vibrations aboard the vessel when he attempted to bring the CAPTAIN JOHN on drydock for repairs at the Great Yarmouth Shipyard in England, but was not able to complete drydocking there because the draft was too deep. Captain Trosclair further testified that at the drydock on Humber River several days later repairs were made to the propellor shafts and wheels of the vessel (Tr.Vol. V, pp. 1001-1005).
The pilothouse log also contains a notation that on November 30th, 1976, the CAPTAIN JOHN struck rock with its bow while on route to the shipyard in Holland (Pilot House Log, November 30, 1976, Plaintiff's Exhibit No. 20A). Plaintiff's Exhibit 9A, Nos. 129 through 131 are of photos of the damaged bow which attest to the severity of the collision. Additionally, the pilothouse log mentions the CAPTAIN JOHN being struck on its stern by a barge on October 30th, 1976 (Pilot House Log, October 30, 1976, Plaintiff's Exhibit No. 20A).
It was admitted by plaintiff's witness, Ralph Gisclair, a representative of Karl Senner, Incorporated who sells and services the type of gears used on the CAPTAIN JOHN, that the type of damage sustained to the propellor shaft of the vessel would indeed damage the gears and cause them to move on their foundations (Tr.Vol. III, pp. 625-627). Jan Keesmaat, a marine surveyor, stated in his deposition that damage to the propellor and shaft could cause vibrations in the gears (Deposition of Jan Keesmaat, p. 78). This opinion was shared by the expert witness, Hector Pazos, who testified that a bent propellor shaft would result in excessive vibrations causing severe damage to many of the components of the propulsion system (Tr.Vol. VII, p. 426). Mr. Pazos stated that the vessel striking the *1185 underwater object on October 18th, 1976 most likely caused damage to the bearings and gears on the CAPTAIN JOHN, particularly since vibrations were noticed by ship personnel as evidenced by the testimony of Captain Trosclair (Tr.Vol. VII, pp. 441, 443). In addition, Mr. Pazos opined that the vessel striking rock with its bow could produce deformation to the whole girder that can result in misalignment of the entire propulsion system (Tr.Vol. VII, p. 495). Mr. Pazos further stated that since no one objected to any vibrations on the CAPTAIN JOHN during the sea trials, it is in his opinion a clear indication that the original alignment of the gears had nothing to do with the failures occurring a number of months after its operation (Tr.Vol. VII, p. 497).
In summary, the Court concludes that the defendants were in no way negligent in the construction of the CAPTAIN JOHN. The plaintiff has failed to prove by a preponderance of the evidence that the CAPTAIN JOHN was delivered to it with defects and/or deficiencies. The vessel passed all sea and dock trials, was accepted by plaintiff and was certified by the A.B.S. In addition, all drawings supplied by Alco for installation of the engines and lube oil piping system were found to be adequate. In fact, these drawings were approved not only by the naval architect of the shipyard, Mr. Y.A. Mok, but also by the A.B.S. (Deposition of Belden Domangue, p. 14). Furthermore, the Court finds that the improper maintenance of oil filters and the straining system and excessive vibrations caused by contaminated fuel and collisions are all reasonable, expected causes of the damages sustained by the CAPTAIN JOHN which have not been reasonably eliminated as causes in fact.

II. M/V CAPTAIN CRAIG
On November 26th, 1976, Service Machine delivered to F & S the M/V CAPTAIN CRAIG (hereinafter referred to as CAPTAIN CRAIG). Because of the alleged problems experienced with the construction of the CAPTAIN JOHN, a complete inspection of the CAPTAIN CRAIG was performed after only one hundred service hours of the vessel (Tr.Vol. II, p. 482). This inspection was performed at Main Iron Works in Houma, Louisiana from February, 1977 through April, 1977 (Tr.Vol. 1, pp. 177-178). Work was performed during this period to the engine and gear foundations and the lube oil piping system of the CAPTAIN CRAIG.
The Court would like to point out at this time that many of the complaints urged by plaintiff concerning the CAPTAIN CRAIG are identical to those made of the CAPTAIN JOHN, since both vessels were identical in design and built in accordance with the same plans and specifications. Thus, for purposes of brevity and to avoid redundancy, the Court will at times refer to its previous discussion of the CAPTAIN JOHN in addressing plaintiff's complaints regarding the CAPTAIN CRAIG.

A. WERE THE DEFENDANTS NEGLIGENT IN THE CONSTRUCTION OF THE FOUNDATIONS OF THE ENGINES AND GEARS OF THE M/V CAPTAIN CRAIG?
Plaintiff alleges that the defendants were negligent in the construction of the foundations for both the starboard and port engines and the starboard and port reduction gears of the CAPTAIN CRAIG. As with CAPTAIN JOHN, the Court will limit its inquiry to those particular steps taken and integral parts used by the defendants in the construction of the CAPTAIN CRAIG which were specifically complained of by the plaintiff in its briefs and at trial.
The plaintiff again alleges that the use of resin chocks instead of steel machined chocks on the foundations of the CAPTAIN CRAIG was improper and constituted negligence on the part of Service Machine. These resin chocks were in fact removed from the CAPTAIN CRAIG while at Main Iron Works and replaced with steel-fitted chocks (Tr.Vol. IV, p. 798).
The Court can again only conclude that the use of Chockfast on the foundations of the CAPTAIN CRAIG, as well as on the CAPTAIN JOHN, in no way constituted *1186 negligence on the part of Service Machine. Mr. Murray Wilson, an expert in the use of resin chocking, testified that the Chockfast was less expensive and faster for a shipyard to emplace and also that it is superior to machined steel chocking for large engines such as those used on the CAPTAIN CRAIG (Tr.Vol. V, pp. 229-230). Unquestionably, the use of Chockfast for the foundations of the CAPTAIN CRAIG was known to the owner, the shipyard, the shipyard's naval architect, Y.A. Mok, and the A.B.S. No one objected to its use even though Robert Thompson testified that he had certain unspecified reservations (Tr. Vol. I, p. 238; Tr.Vol. II, pp. 401-404; Tr. Vol. V, pp. 1058-1059).
In addition, the Court finds that Service Machine was not negligent in the actual application of the Chockfast. The Court again points out the testimony of Mr. Murray Wilson, who stated that the thickness of the Chockfast has nothing to do with its strength, and even the application of only one-fourth inch of Chockfast would have been sufficient to withstand the compressive strength of the engines of the CAPTAIN CRAIG (Tr.Vol. VI, p. 237). In fact, Leroy Molaison, general manager of Main Iron Works and overseer of the work performed on the CAPTAIN CRAIG while there, testified that he found no part of the Chockfast on the CAPTAIN CRAIG to be broken (Tr.Vol. IV, p. 805).
Unlike the CAPTAIN JOHN, Service Machine built steel boxes, or pedestal mounts, to mount the engines of the CAPTAIN CRAIG. These steel boxes were situated on the port and starboard ends of the engines and were actually attached to the engine girders. Chockfast was poured on top of these boxes, with the engines resting on top of the resin. Bolts were driven from the engine feet through the boxes into the main engine girders (Tr.Vol. IV, p. 791-792). Plaintiff alleges that the use of these steel boxes constituted negligence on the part of Service Machine since they were inadequate to support the engines on the CAPTAIN CRAIG. These boxes were removed at Main Iron Works and replaced with a heavier steel plate (Tr.Vol. IV, p. 798).
The evidence presented at trial indicates that Service Machine had prefabricated the foundations of the CAPTAIN CRAIG, and when it came time to install the engines, a discrepancy of a couple of inches between the face plate of the foundation and the footing of the engines was discovered. The construction of the steel boxes was devised as a means to fill this void and raise the foundations. Mr. Hector Pazos, an expert in marine engineering, who actually inspected these boxes, found nothing wrong with their use. In his expert opinion, the boxes were capable of transmitting the same stresses as the basic foundation, and were in fact an extension of the foundation (Deposition of Hector Pazos, pp. 45-46). As to the welding of the boxes to the foundation, Mr. Pazos testified that he found no cracks in the welds, and felt that the amount of welding actually done on these boxes was ten times more than needed (Tr. Vol. V, p. 1225; Tr.Vol. VII, p. 471). In addition, Mr. Pazos opined that there was ten to twenty times more steel used on the boxes than required, and that the boxes were actually over-substantial for their intended purpose (Deposition of Hector Pazos, pp. 46, 68, 95).
The Court can only conclude that there existed no negligence on the part of Service Machine in the construction of these steel boxes. No objection was made as to the use of these boxes during the construction of the CAPTAIN CRAIG. Robert Thompson testified that he made no recommendation or suggestions to F & S regarding any changes to the foundation of the CAPTAIN CRAIG (Tr.Vol. I, p. 238). The CAPTAIN CRAIG passed all sea and dock trials and was certified by the A.B.S. In fact, the A.B.S. representative, Mr. Roy Boyett, particularly approved the use of these steel boxes after delivery of the CAPTAIN CRAIG to the plaintiff (Tr.Vol. V, p. 1078).
As with the CAPTAIN JOHN, plaintiff complains that not all the bolts on the CAPTAIN CRAIG were body-bound, and that the collision chocks on the vessel were improperly *1187 installed. As mentioned earlier, the Alco and Reintjes drawings require body-bound bolts on the drive end of the engine and on the gearbox. Collision chocks are recommended for the front end of the engine.
The Court finds the evidence presented by plaintiff concerning Service Machine's alleged negligent installation of these bodybound bolts on the CAPTAIN CRAIG to be even weaker than that presented with respect to the CAPTAIN JOHN. There was no evidence presented by plaintiff concerning the lack of body-bound bolts on the drive end of the engines of the CAPTAIN CRAIG. The only evidence presented in support of this complaint by plaintiff was the testimony of Mr. Ralph Gisclair, a representative of Karl Senner, Incorporated, who examined the CAPTAIN CRAIG after the vessel had undergone one hundred working hours of operation. Mr. Gisclair testified that some of the bolts on the gearbox were in fact body-bound. As to the other gearbox bolts, Mr. Gisclair only stated that they were so tightly installed that he was actually unable to determine if they were in fact body-bound bolts or not (Tr. Vol. III, pp. 607-608).
On the other hand, the Court finds the evidence presented by the defendant to sufficiently support its contention that these body-bound bolts were in fact installed where required on the CAPTAIN CRAIG. Mr. Steve Larcade, who installed the engines and gears on the CAPTAIN CRAIG, testified in detail as to the procedure he and his crew followed in installing body-bound bolts on the drive end of the engines and on the gearboxes of the CAPTAIN CRAIG. Mr. Larcade stated that several representatives of the gear manufacturer inspected and approved every step of the installation of the body-bound bolts on the gearboxes (Tr.Vol. VI, pp. 127-134).
Unlike the CAPTAIN JOHN, plaintiff admits that collision chocks were installed on the CAPTAIN CRAIG, but contends that those installed on the gearbox of the CAPTAIN CRAIG were done negligently. Mr. Ralph Gisclair testified that upon his inspection of the CAPTAIN CRAIG he found the gearbox collision chocks were not touching the gearbox at all, as is recommended by the gear manufacturer (Tr.Vol. III, p. 599).
As with the collision chocks on the front end of the engines, the Court finds that these gearbox collision chocks are just an extra precautionary measure, in addition to the body-bound bolts, to assure that the gearbox remains stable on its foundations. Mr. Gisclair's testimony supports this conclusion. Mr. Gisclair testified that the main support for the gears are the body-bound bolts located on each side of the gearbox; the collision chocks are installed to keep the gearbox from moving in the event some catastrophe should cause these body-bound bolts to be sheared from their foundations (Tr.Vol. III, pp. 630-632). The Court again refers to the testimony of Mr. Hector Pazos, an expert in naval architecture and marine engineering, who testified that after thirty years experience in designing vessels for the United States Navy and merchant fleets, he saw no reason to place collision chocks on the gears where body-bound bolts already existed. In fact, Mr. Pazos strongly disfavored their application due to the thermal stresses such chocks place on the gear casings (Tr.Vol. V, pp. 1232-1234).
Even if these chocks were improperly installed, it would only prove that Service Machine did not take every possible step as recommended by the gear manufacturer to assure the stability of the gearbox to its foundation. By correctly installing the body-bound bolts on the gearbox, which the Court finds it did, Service Machine took sufficient steps to secure the gearbox. There was no evidence that these bodybound bolts were sheared, loose, or in any way incapable of serving their function. Mr. Gisclair testified that upon inspection of the CAPTAIN CRAIG he found no damage to the collision chocks, no broken welds or any signs of bending from stress or pull.
The Court finds that Service Machine was not negligent in the installation of the body-bound bolts and collision chocks on the CAPTAIN CRAIG. Representatives of the *1188 gear and engine manufacturers were present during the construction of the CAPTAIN CRAIG, and no objections were made regarding the installation of these bolts and chocks. The vessel passed all sea and dock trials and was certified by the A.B.S. Mr. Ralph Gisclair even testified that despite the complaints he noted about the bodybound bolts and collision chocks, in his opinion they had not caused any malfunction in the operation of the vessel. In addition, Mr. Gisclair stated that the fact that the CAPTAIN CRAIG was commissioned by the A.B.S. indicated that everything was operating properly, especially the gears (Tr. Vol. III, pp. 649-650).
Plaintiff also complains that Service Machine negligently installed a steel filler plate beneath the gearbox of the CAPTAIN CRAIG. Plaintiff bases its complaint on the testimony of Ralph Gisclair, who testified that upon his inspection of the CAPTAIN CRAIG he found the plate to be only partially welded and that there was a gap between the plate and the engine girder (Tr.Vol. III, p. 577). The testimony of Steve Larcade at the trial verified plaintiff's contentions that the filler plate had not been welded all the way around. Mr. Larcade testified that he was able to weld the plate on the ends, on the outside and almost all the way around the inside of the plate except for eleven inches which could not be reached (Tr.Vol. VI, pp. 131-132). There was no evidence presented that these welds had broken, fractured or were deformed in any manner.
The Court is again of the opinion, as with the CAPTAIN JOHN, that if these welds did not crack or separate from their original position, then the welds served their purpose of keeping the plate intact. The expert opinion of Hector Pazos supports this conclusion. As mentioned earlier, Mr. Pazos stated that the fact that these welds were not broken means that the weld was structurally sound and of the proper size. These welds are designed to transmit the compressive forces applied to these filler plates; if the welds were not fractured, then they were within the capacity of transmitting these compressive forces (Tr.Vol. VII, pp. 456, 459).
As to the gap in the filler plate, the Court finds that plaintiff has failed to prove by a preponderance of the evidence that such gap was a result of Service Machine's negligent installation of the filler plate. As with the welds, no complaint was made during the installation of the filler plate by the gear representatives, despite their ongoing inspection of such installation (Tr.Vol. VI, pp. 128-132). Whereas the Court admits that the plate should have been flush with the foundation upon installation, there was no evidence presented to indicate otherwise. Mr. Gisclair, who examined the plate after the CAPTAIN CRAIG was delivered and in operation for over one hundred working hours, testified that there was no way for him to determine if the plate had not been originally installed to fit flush with the foundation (Tr.Vol. III, pp. 577, 606). Thus, the Court finds that Service Machine was not negligent in the installation of this filler plate.
Mr. Ralph Gisclair also testified that upon his inspection of the CAPTAIN CRAIG, he found the gears and the propellor shafts to be grossly misaligned. Mr. Gisclair was of the opinion that if the gears were allowed to be operated any further with this degree of misalignment, considerable damage would result to the gears (Tr.Vol. III, pp. 616, 618).
Certainly Service Machine's delivery of the CAPTAIN CRAIG to F & S with this degree of misalignment reported by Mr. Gisclair would constitute negligence on Service Machine's part. However, there is strong evidence to support the contention of Service Machine that the gears and propellor shafts were correctly aligned upon delivery of the vessel to F & S. Mr. Steve Larcade, who installed the gears and engines on the CAPTAIN CRAIG, once again testified in detail about the procedure he followed in aligning the gears and the propellor shafts (Tr.Vol. VI, pp. 127-130). Mr. Larcade testified that several representatives from Karl Senner, Incorporated, who sells and services the reduction gears *1189 (Reintjes) used on the CAPTAIN CRAIG, along with a representative of Alco, made ongoing inspections of this gear and propellor shaft alignment, and were in fact satisfied with the results (Tr.Vol. VI, pp. 128-130, 144-145). The CAPTAIN CRAIG passed all sea and dock trials, was accepted by F & S and certified by the A.B.S. before delivery. The gear and engine representatives were also satisfied that their equipment was functioning properly, including the gear, engine and propellor shaft alignment (Tr.Vol. I, pp. 234-235).
Not only is the Court convinced that the gears and the propellor shafts were correctly aligned upon delivery of the CAPTAIN CRAIG in October of 1976, but it is also convinced that the alignment remained proper for some time after delivery. Mr. Julian Fernandez, Chairman of the Board and chief executive officer of Service Machine, testified that an alignment check was made of the gears, engines and propellor shafts of the CAPTAIN CRAIG in January, 1977. The report of this alignment check, which was requested and performed by Alco, indicated that the alignment was still within the permissible tolerance levels, and was in fact accepted by Alco (Tr.Vol. V, pp. 1085-1086).
The Court does not question the fact that the gears and propellor shafts were misaligned when Mr. Gisclair examined the CAPTAIN CRAIG some one hundred working hours after the vessel was delivered by Service Machine. However, in light of the above evidence, the Court does not feel that this misalignment was the result of any negligent act on the part of Service Machine. In addition, the Court is cognizant of certain evidence presented at trial that sheds some light on the possible cause of the misalignment experienced on the CAPTAIN CRAIG. Mr. Joseph Redin, the engineer aboard the CAPTAIN CRAIG from October, 1976 through January, 1977, testified that on December 16th, 1976 he reported in the engine log book that more water than fuel was found in the fuel tanks of the CAPTAIN CRAIG. Mr. Hector Pazos, who testified as an expert in marine engineering, stated that such water in the fuel could cause the powerful diesel engines of the CAPTAIN CRAIG to misfire, resulting in excessive vibrations. These vibrations could cause substantial damage to the components of the propulsion system, including the gears (Tr.Vol. VII, pp. 426-428). In fact, Mr. Redin testified that he noticed excessive vibration of the vessel while he was aboard (Tr.Vol. IV, p. 762). The fact that the engines, gears and propellor shafts were still aligned within permissible limits when inspected in January of 1977 does not perplex the Court, for Mr. Pazos testified that the damage resulting from such vibrations may not necessarily manifest themselves immediately. (Tr.Vol. VII, p. 427).

B. WERE THE DEFENDANTS NEGLIGENT IN THE CONSTRUCTION OF THE LUBE OIL PIPING SYSTEM ON THE M/V CAPTAIN CRAIG?
Plaintiff alleges that the lube oil piping on the CAPTAIN CRAIG was contaminated with weld beads and weld splatter. Mr. Carl Elsner, a representative of Alco, had occasion to visit the CAPTAIN CRAIG in January of 1977 and made an inspection of the lube oil piping on the vessel. Mr. Elsner in fact inspected a three foot section of the pipe between the lube oil strainers and the engine and found it to contain weld beads and weld splatter. Upon this discovery, Mr. Elsner ordered the entire piping to be removed and cleaned again, which was done (Tr.Vol. VI, p. 186; Tr.Vol. VIII, pp. 24-26; Deposition of Carl Elsner, pp. 26-27). Plaintiff contends that the condition of this pipe, as testified to by Mr. Elsner, was the result of the negligent installation of the pipe by Service Machine, particularly with respect to Service Machine's failure to adequately clean the pipe upon original installation.
The Court is not convinced that the lube oil piping of the CAPTAIN CRAIG was not cleaned before its original installation by Service Machine. Mr. Steve Larcade, who installed the lube oil piping on both the CAPTAIN JOHN and CAPTAIN CRAIG, testified that he followed the same procedure on both vessels in installing the pipe, *1190 which included sending the pipe to be cleaned by an independent contractor, Plastic Applicators, Incorporated, before its actual installation in the vessel. When the pipe was returned, Mr. Larcade examined portions of the inside of the piping and found them to be sufficiently clean (Tr.Vol. VI, pp. 115-119, 122-124, 147, 159, 162, 185).
The lube oil piping was again cleaned in January of 1977 pursuant to the request of Carl Elsner, as mentioned above (Tr.Vol. VI, p. 186). Mr. Larcade did admit that there was a small amount of weld splatter attached to the walls of pipe which, in his opinion, could not be removed by the cleaning process (Tr.Vol. VI, p. 162). This opinion by Mr. Larcade is supported by the testimony of Mr. Wayne Duboc, an independent marine surveyor who also examined the lube oil piping prior to its being sent to be recleaned in January of 1977. Mr. Duboc testified that upon his examination of the pipe, he also found a very minor amount of weld splatter attached to the pipe, along with a small amount of loose particles remaining in the crevices of the flanges of the piping. Other than this, there was no other foreign matter found in the piping. When the pipe was returned from being cleaned the second time, Mr. Duboc again examined the pipe and found the same weld splatter still adhering to the inside of the pipe. In fact, the pipe was returned virtually in the same condition that it had left in (Tr.Vol. VII, pp. 316-318).
The Court finds that Service Machine was not negligent in the installation of the lube oil piping system of the CAPTAIN CRAIG. The pipe was adequately cleaned before its original installation so as to sufficiently protect the engines from any harm due to the intake of welding contaminants. Mr. Wayne Duboc testified that the weld splatter actually found in the pipe was not unusual, and could be found in any welded pipe. Mr. Duboc further stated that this weld splatter could not be removed by any chemical-solution, such as that used by Plastic Applicators, Incorporated, nor could it be removed by the passage of lube oil through the pipe (Tr.Vol. VII, pp. 319, 347). This opinion is certainly supported by the facts, for the weld splatter attached to the pipe remained there despite being cleaned twice and the vessel undergoing over two months of operation. Furthermore, no foreign matter was discovered in the filters or strainers of the lube oil system (Tr.Vol. VII, pp. 347, 360).
In summary, the Court finds that the defendants were in no way negligent in the construction of the CAPTAIN CRAIG. The work performed on the CAPTAIN CRAIG while at Main Iron Works was not necessitated by any act of negligence on the part of the defendants during the original construction of the vessel. In fact, Leroy Molaison, Executive Vice President of Main Iron Works, testified that the largest percentage of the work performed on the CAPTAIN CRAIG was for additional brackets that had nothing to do with the mounting of the engines or gears themselves (Tr.Vol. IV, pp. 845-846). The vessel passed all sea and dock trials, was accepted by plaintiff, and was certified by the A.B.S. In addition, Mr. Hector Pazos, an expert in naval architecture and marine engineering, testified that from his own investigation he found no deficiencies in the construction of the foundations or the installation of the engines and gears (Vol. V, pp. 1225-1228).
EDWARDS, Judge, concurring.
I concur in the result. The trial court held that the defendants were not guilty of negligence in the construction of the engine/gear foundations and the lube piping system. Plaintiffs, on appeal, assert that the trial court's decision was manifestly erroneous, and also that no consideration was given to their claim of redhibition and strict liability.
I find the trial court's decision supported by the record. Moreover, its factual findings establish that plaintiff failed to prove the existence of defects at delivery which would support a strict liability or redhibitory cause of action.
NOTES
[1] F & S subsequently changed its name to Newpark Offshore Marine, Inc.
[2] American Bureau of Shipping.
[3] References to the record in the trial court opinion have been deleted.
[4] The strict liability provided for in La.C.C. art. 2317 is not applicable in the instant case because the things which were allegedly defective were not in the care and custody of the defendant at the time that damage occurred. Loescher v. Parr, 324 So.2d 441 (La.1975).
[5] Without a sale, there can be no redhibition. See Duhon v. Three Friends Homebuilders Corporation, 396 So.2d 559 (La.App. 3rd Cir.1981). However, whether the contract in the instant case is a sale or a contract to build need not be determined because of the analytical approach adopted. If the contract was not one of sale and redhibition is not applicable, the general maritime law and/or La.C.C. art. 2315 are still applicable.
[6] See, for example, Dye v. Kean's, 412 So.2d 116 (La.App. 1st Cir.1982), writ denied 413 So.2d 506 (La.1982).