**JETERO CONSTRUCTION COMPANY, INC., Plaintiff-Appellee,**

v.

**SOUTH MEMPHIS LUMBER COMPANY, INC., Defendant-Appellant.**

Nos. 75–1566, 75–1567.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1975.

Decided March 2, 1976.

As Amended March 29, 1976.

struction Co. (Jetero) with 60,000 "2″ x 4″ x 92⅝″ # 2 spruce studs" to be used in the construction of the Audubon Square condominium project in Memphis, Tennessee. Delivery of the studs began on May 4, 1973 and ended on May 23, 1973. A total of 64,412 studs were delivered, the quality of the first 16,000 studs delivered which had ends painted with red paint is not in dispute. The dispute giving rise to this action centers on whether the remainder of the studs which SML delivered, which had ends painted with green paint or which were unpainted, were of the same general quality as the "# 2 spruce studs" specified in Jetero's purchase order.

Jetero filed suit against SML in District Court alleging that the studs supplied by SML which had green or unpainted ends were of a quality inferior to that specified in the purchase order. SML responded and admitted that a contract had been made but denied that the studs supplied were defective. Two separate civil actions filed by SML in state court to enforce materialmen's liens and to secure other relief from Jetero's refusal to pay sums due under the contracts involved were removed and consolidated with Jetero's action. The District Court deferred resolution of these two cases until the Jetero action had been resolved.

In the spring of 1973, Dick Whittington, project manager for Jetero, and Gene Lamb, regional construction manager for Jetero, met with Jack Vann, a representative of SML, to discuss SML supplying Jetero with studs and other lumber. One of these discussions took place at the SML yard where Vann showed Lamb various samples of lumber which Jetero would need for the Audubon project. One of the samples shown Lamb was a stack of "red end" 2″ x 4″ building studs. Either during this visit or on a separate visit, Dick Whittington was also shown the "red end" type studs. The ends of studs are painted to retard splitting and to identify the mill which cut them. Vann had reviewed summary sheets of Jetero's lumber needs for the Audubon project, the summary had

Scott F. May, Arnoult, Hill & May, Memphis, Tenn., for defendant-appellant.

Kemper B. Durand, Rosenfield, Borod, Bogatin & Kremer, Memphis, Tenn., for plaintiff-appellee.

Before CELEBREZZE, PECK and ENGEL, Circuit Judges.

CELEBREZZE, Circuit Judge.

In April of 1973 South Memphis Lumber Co. (SML) contracted to supply Jetero Con-

been prepared by Jetero's architects and specified 139,000 "yellow pine Kd studs." Vann provided Lamb with an itemized bid on the Audubon project on behalf of SML. While one of the Jetero representatives was at the SML yard, Vann described the "red end" type studs as "# 2 spruce studs." Lamb asked Vann if the "red end" studs which he saw in the SML yard were equivalent to the studs required in the specifications for Audubon. Vann assured Lamb that spruce "stud grade" lumber was equivalent to the studs specified. Vann also told Lamb that he had enough "red end" studs to meet Jetero's needs, as he had 20,000 "red end" studs on hand and had access to 40,000 more. Lamb was not an expert on lumber grading and relying on Vann's expertise, ordered 60,000 "2″ x 4″ x 92⅝″ # 2 spruce studs" at a total price of $68,880.86. Lamb believed that the studs to be delivered would be like the "red end" studs which he saw at the SML yard. Lamb also believed, based on Vann's representations, that these studs were reasonably equivalent to the "yellow pine Kd studs" specified by the architect.

Ron Rolen, Jetero's field clerk, was charged with inspecting and keeping track of supplies at the Audubon job site. Rolen inspected the SML shipments as they arrived. The studs were stacked in a separate area of the jobsite. The first 16,000 studs delivered were of the "red end" variety. After the initial shipments, Rolen noticed that the studs delivered by SML had either green or unpainted ends. Rolen noticed that the later shipments of studs did not appear to be of as high a quality as the earlier shipments. Rolen noted that when bundles from the later shipments were opened the studs would warp or bow. Rolen alerted Whittington and he called Vann. Vann assured Whittington that the studs were all right and conformed to Lamb's order. Jetero continued to accept delivery on that basis.

Since 139,000 2″ x 4″ studs would be needed on the Audubon project, Jetero ordered 80,000 "black diamond stressed Kd studs" from a supplier other than SML. This lumber was delivered shortly after SML had completed delivery of the studs which it supplied. The "black diamond" studs were supplied by Luther Johnson, a Georgia lumber broker.

Near the end of May of 1973, Jetero began using the SML studs to construct the frames of the Audubon condominiums. In mid-June of 1973, the first frame was erected and others were begun. Shortly thereafter Jetero employees noticed that the SML studs used in the frames began to "warp, twist, buckle" and turn a darker color. A monthly inspection of the jobsite by representatives of the architect and the owner of the project and by Austin, the President of Jetero, produced a decision that the SML studs with green or unpainted ends which had been used had to be replaced. Some 13,640 SML studs were replaced. None of the studs which had to be replaced were of the "red end" type.

The removed studs were substantially useless for construction, and were disposed of by Jetero. The bulk of the "green end" or unpainted studs, apparently over 34,000, remained in bundles stacked at the construction site. Jetero considered this lumber unsuitable for use at Audubon. Jetero then contacted Hart, a Texas manufacturer who did business with Jetero. Hart shipped 25,728 studs to Jasper, Texas. He was to have the studs nailed in pairs in an effort to straighten them for possible use in other Jetero projects. Jetero paid Hart $4,461 for this service but the lumber still proved inadequate. Jetero made two written demands of SML to remove and replace the defective studs at SML's cost. On October 1, 1973, SML responded claiming that the lumber was not defective and that it conformed to the purchase order.

Following a trial in District Court at which both sides presented a number of witnesses, the District Court, on December 13, 1974, issued a lengthy opinion in which it concluded that SML had, under Tennessee law, breached its implied warranties of merchantability and fitness for a particular

purpose. The District Court awarded $16,-000 damages for the breach and $8,743.50 as consequential damages for the cost of removing and replacing the 13,640 studs which had been utilized for a total award of $24,743.50. Before judgment was entered, Jetero, on December 19, 1974, pursuant to Rule 59(e), Federal Rules of Civil Procedure, filed a Motion to Alter or Amend Judgment seeking an increased damage award for the breach. On January 16, 1975, the District Court issued an order which noted Jetero's motion and despite noting generally some factors adverse to Jetero, raised the damages award for breach to $20,000, for a total judgment of $28,743.50. On January 27, 1975, eleven days after entry of judgment, Jetero filed another memorandum with the District Court, styled "Memorandum of Jetero Construction Company." The District Court, apparently treating this memorandum as another Rule 59(e) motion to alter or amend judgment, entered an "Amended Final Judgment" on February 19, 1975. This "Amended Final Judgment", with only a notation that the court had considered Jetero's latest memorandum and SML's response, raised the damage award for breach to $30,000, the consequential damages remained constant and the total award was $38,743.50.

SML brings this appeal challenging as clearly erroneous the District Court's decision and Jetero cross-appeals seeking a larger damage award.

Before turning to consideration of the merits of this appeal we are compelled to review the District Court's highly unusual post-opinion procedure of in effect twice reconsidering its damage award. We believe the District Court was without jurisdiction to enter its "Amended Final Judgment."

Although the District Court issued an opinion in this action on December 13, 1974, a review of the record indicates that a separate document setting forth the judgment in compliance with Rule 58, Fed.R. Civ.P., was not entered until January 16, 1975.

Rule 58 states, in pertinent part:

. . . [e]very judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a).

After the District Court's memorandum opinion had been filed but before the January 16, 1976, entry of judgment, Jetero filed a motion to alter or amend judgment seeking a larger damage award. This Court noted in *Cohn v. United States,* 259 F.2d 371, 376 (6th Cir. 1958):

> Generally, when a District Court acquires jurisdiction over the parties and the subject matter of a case filed in its court, such jurisdiction continues, in the absence of statutory enactments to the contrary, until final disposition of the cause. [citations omitted] Until the entry of its judgment disposing of the litigation, such court has the inherent power to correct any error of its own which it may have previously made in its handling of the case.

*See also* 5A J. Moore, Federal Practice, Para. 52.11[1], at 2749 (2d ed. 1975).

The District Court's consideration of Jetero's motion to alter or amend was proper and the January 16, 1975, entry of judgment in this action was an acceptable procedure. We note, however, that a District Court's disposition of an action is not final for purposes of appeal and for purposes of various post-judgment motions until judgment has been entered. The interests of justice are best served by the District Court avoiding unnecessary delay in the entry of judgment.

On January 27, 1975, Jetero filed a pleading styled "Memorandum of Jetero Construction Company." In this memorandum Jetero contended that it should have received a judgment of at least $53,623.02, rather than the $28,743.50 awarded by the January 16, 1975, judgment. Jetero contended that the District Court must have failed to consider its losses on the 25,728 studs which were sent to Texas for attempted straightening.

On February 19, 1975, the District Court filed an "Amended Final Judgment", rais-

ing its damage award to Jetero for SML's breach from $20,000 to $30,000. The total award, including $8,743.50 for consequential damages which remained constant, was thus increased to $38,743.50. This figure fell far short of the amount requested by Jetero. The District Court gave no reason for the increase, stating only that it had "studied the memoranda submitted by both parties."

We believe that in the interest of finality the District Court should not have considered Jetero's January 27, 1975, memorandum which was in effect a request to renew its argument a third time.

In the instant action, the District Court's refusal to consider the memorandum would have worked no real hardship as Jetero by virtue of its filing of a motion to alter or amend before entry of judgment had its arguments considered twice by the District Court. A party should not be allowed to force a District Court to consider for a third time arguments previously made. The District Court therefore should not have entered its February 19, 1975, "Amended Final Order" and its January 16, 1975, order must stand as the final judgment of the District Court in this action.

We now turn to consideration of the issues raised on appeal by the parties. We first consider SML's contention that the District Court clearly erred in its findings

of fact supporting its conclusion that SML breached its implied warranty of merchantability and breached its implied warranty of fitness for a particular purpose by supplying Jetero with defective lumber. SML also contends that the District Court's findings of fact as to the issue of damages were not made with sufficient particularly so that they may be reviewed by this Court.

Rule 52(a), Fed.R.Civ.P., provides, *inter alia,*

"[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

◼ A factual determination will not be overturned unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake was committed." *United States v. U. S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948).

◼ Tennessee has adopted the Uniform Commercial Code. The two warranties which the District Court found SML to have breached are embodied in the Tennessee Code Annotated as § 47–2–314 and § 47–2–315.[1] The District Court's conclusion that SML breached its implied warranty of merchantability was based on its findings that SML did not send to Jetero build-

---

1. 47–2–314. *Implied warranty—Merchantability—Usage of Trade.*—(1) Unless excluded or modified (§ 47–2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (§ 47–2–316) other implied warranties may arise from course of dealing or usage of trade. [Acts 1963, ch. 81, § 1 (2–314).]

47–2–315. *Implied warranty—Fitness for particular purpose.*—Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose. [Acts 1963, ch. 81, § 1 (2–315).]

ing studs which were of "fair average quality" within the description or sample agreed upon. The District Court found that the majority of the studs in question were much lower in quality than the " # 2 spruce studs" agreed upon. These delivered studs were not "fit for the ordinary purposes" for which such studs were to be used, the construction of buildings which would meet minimum general construction standards.[2]

SML contends that the only support for these findings are "the 'self-serving' statements of the Jetero employees or persons who do business with Jetero (Johnson)."[3] Yet the bulk of the testimony which SML would have this Court rely upon in overturning the District Court's findings is that provided by SML employees. The District Court was presented with conflicting testimony and it chose to rely in large part on Jetero's witnesses in framing its findings.

We do not find the Court's conclusion clearly erroneous. Where there is evidence supporting either of two conclusions it is the province of the trial court to weigh that evidence and decide upon the proper conclusion. As the Supreme Court stated in *United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150, 153 (1949), "a choice between two permissible views of the weight of evidence is not 'clearly erroneous.'"

The District Court further concluded that SML breached its implied warranty of fitness for a particular purpose. This conclusion was based on the following findings of fact:

Vann knew generally of the purpose for which the building studs would be used. Specifically, he viewed the building site and surveyed the list of goods which were to be used in the construction of the entire Audubon development. Vann was an experienced lumber dealer and had greater skill and judgment than the Jetero representative did concerning the spec-

ifications of various lumber types and grades and the suitability of such lumber for specific construction projects.[4]

Here again, SML points to unrelated portions of testimony and contends that the content of this testimony conflicts with the District Court's findings on this issue. Typical is SML's reference to notes made by Jetero's project manager, Whittington, in a project diary dealing with the Audubon project that it was "[T]oo wet to plow" at the Audubon jobsite. From this language SML apparently extrapolates the conclusion that the studs it delivered were of good quality but were damaged by rain. We find no evidence of record supporting such a conclusion. There is, however, extensive support in the record for the District Court's findings on this issue.

Gene Lamb, the regional project manager for Jetero, testified:

Q. Did you rely on the salesman? A. I relied, can I tell you how I would like to?

Q. Yes, sir. Okay. A. The plans and specs are issued by the architect. Almost every architect has one in their office, that is, totally acquainted with specs of lumber. We are issued plans and specs to build a job by. I take off quantities of lumber to be used and give these quantities, with specs, to the prospective people that I may buy from, depending on price, their availability to ship the lumber, et cetera. I usually try to pick somebody that is reputable, known to be honest and capable, and in this case, it was a very large job, and very large number of board lumber to be shipped.

Q. All right, sir.

Did you furnish the specifications and takeoffs to Mr. Jack Vann of South Memphis Lumber Company? A. In some manner, he was very acquainted with both. Now, whether I gave him my sheet or just told him what I was looking for, I just don't remember.

---

2. *Jetero Construction Co., Inc. v. South Memphis Lumber Co., Inc.*, No. C–73–481 (W.D. Tenn., filed Dec. 13, 1974), Appendix at 14–15.

3. Appellant's brief at 14.

4. District Court Opinion, Appendix at 15–16.

Q. All right, sir.

On this particular day, when you saw these red-end [161] studs, do you recall how many were there? A. I didn't count them myself. It was my understanding, from Mr. Vann, there were approximately sixteen to twenty thousand studs on the yard.

Q. Did Mr. Vann, being familiar with your requirements, recommend these red-end studs to you? A. I won't say "recommended". I remember asking the question that if I used this particular stud, would it be comparable to my specs of number two KD pine, and his answer was "Definitely so."?[5]

The District Court also had before it the testimony of Luther Johnson, a Georgia lumber supplier, that # 2 grade studs would not have warped, bowed and discolored to the extent that the SML green end and unpainted studs did.[6] The District Court also was able to examine Exhibit 3, a discolored stud submitted as an example of the studs at issue. This stud bore the grade mark "stud" and had no markings indicating that it was of number two quality or equivalent. This evidence and testimony provides a substantial basis for the District Court's finding. SML has failed to demonstrate that the District Court's findings supporting its conclusion that SML breached its implied warranty of fitness for a particular purpose are clearly erroneous.

■ SML also argues that the District Court's findings of fact as to damages were not made with sufficient particularity so that they may be reviewed by this Court. The Supreme Court in *Hatahley v. United States*, 351 U.S. 173, 182, 76 S.Ct. 745, 752, 100 L.Ed. 1065, 1074 (1955), a Federal Tort Claims Act case, reversed the judgment and remanded the cause to the District Court, stating:

But it is necessary in any case that the findings of damages be made with suffi-

cient particularity so that they may be reviewed. Here the District Court merely awarded the amount prayed for in the complaint.

In *Traylor v. United States*, 396 F.2d 837, 840 (6th Cir. 1968), we vacated the judgment in a Federal Tort Claims Act case because the District Court did not make "findings of fact or conclusions of law concerning the basic elements of damages or the amounts awarded for each element." *See also United States v. Claycraft Co.*, 408 F.2d 366 (6th Cir. 1969); 5A J. Moore, Federal Practice, Para. 52.06[2], at 2718–2719 (2d ed. 1975).

The following are the findings of fact as to damages which the District Court made in its memorandum opinion:

"There were 13,640 studs from SML Co.'s shipments to Jetero which were used in the construction of the first six buildings in the Audubon development, but which were so unsatisfactory that they had to be taken out of the buildings and replaced. In addition there were additional SML Co. studs which proved virtually worthless."[7]

Based on these terse findings the District Court awarded $16,000 damages for the breach of warranties. Jetero then filed its motion to alter or amend and the District Court filed a January 16, 1975, order entering judgment in the amended amount of $20,000 for the breach. In this order the court noted that it had considered the various pleadings and memoranda filed by both parties and added the following paragraph, which basically appears to be factual findings:

Not all of the studs in controversy were shown by plaintiff to be defective. The plaintiff itself had failed to specify "kiln dried" studs which are more expensive than non-kiln dried. Plaintiff's handling of the defective studs and dumping or destruction of some of them without reasonable salvage efforts (except for the

---

5. Appendix at 51–52.

6. *See generally* Appendix at 46–47.

7. District Court Opinion, Appendix at 17.

Hart disposition) was a failure to mitigate to some extent. Plaintiff is only entitled to a difference between the value or quality delivered and the value or quality ordered. Plaintiff was slow in notifying the seller of the claimed breach, increasing defendant's hazard.[8]

The above language clouds the issue. These findings seem to be supportive of a decrease rather than an increase in the damage award for breach. Yet, with only a general reference to Jetero's arguments in its motion, the District Court increases the damage award by $4,000. A review of Jetero's memorandum in support of its motion to alter or amend indicates that Jetero contended that the damages for breach should have been $44,879.52 rather than $16,000. The motion is of little use in discerning how the District Court arrived at $20,000 damages for breach.

The January 16, 1975, judgment of the District Court is vacated and the case is remanded for appropriate findings of fact and conclusions of law as to the proper measure of damages for SML's breach of its implied warranties of merchantability and fitness for a particular purpose.

Each party to bear own costs.