**DUGAN & MEYERS CONSTRUCTION CO., INC. and The Goettle Co., Plaintiffs-Appellees,**

v.

**WORTHINGTON PUMP CORPORATION (USA), Defendant-Appellant.**

No. 83–3525.

United States Court of Appeals, Sixth Circuit.

Argued May 11, 1984.

Decided Oct. 26, 1984.

Contie, Circuit Judge, filed concurring opinion.

William R. Hardy (argued), Graydon, Head & Ritcher, Cincinnati, Ohio, for defendant-appellant.

James W. Halloran (argued), David L. Barth, Cincinnati, Ohio, for plaintiffs-appellees.

Before CONTIE and WELLFORD, Circuit Judges, and COHN, District Judge.*

COHN, District Judge.

## I.

This is a breach of contract case. On April 20, 1983 the district court, following a bench trial, entered a judgment against defendant Worthington Pump Corporation (USA) (Worthington) for $424,625.24 in fa-

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

vor of plaintiffs Dugan and Meyers Construction Co., Inc. (Dugan & Meyers) and The Goettle Co., (Goettle), for the damages it found they suffered because of the failure of the mixed liquor pumping system at the Little Miami Waste Water Treatment Plant (the Plant) operated by the Metropolitan Sewer District of Greater Cincinnati (the District).

E.C.I. Company (E.C.I.), a wholly owned subsidiary of Dugan & Meyers, was the prime contractor for general construction work in improvements at the Plant which included the mixed liquor pumping system. The work was actually performed by Dugan & Meyers and Goettle as a joint venture. Worthington was a subcontractor for the pumps, motors and control panels of the mixed liquor pumping system.

The district court found that Worthington breached an implied warranty of merchantability and fitness for a particular purpose in the work that it did. Ohio Rev. Code § 1302.27 (U.C.C. § 2–314) and § 1302.28 (U.C.C. § 2–315). Worthington appeals.

We find that the district court erred in concluding that Worthington's limited warranty terms were not part of its subcontract and also erred in concluding that Worthington breached an implied warranty. The subcontract documents expressly limited Worthington's warranty to eighteen months following delivery of the particular equipment it furnished. Additionally, Worthington did not subcontract to deliver the complete mixed liquor pumping system. There was no evidence that the particular equipment delivered by Worthington did not meet specifications or that there was any defect in the equipment at the time it was delivered.

## II.

Our conclusion that the district court erred in holding that Worthington's war-

ranty terms were not part of its subcontract requires us to review the trial record in some detail. We will do this by first reviewing the documents which reflect the subcontract[1] and then the testimony regarding these documents. This review is also relevant to our conclusion that the district court erred in holding that Worthington breached an implied warranty because, as shall be seen *infra,* the district court defined the scope of the work performed by Worthington in considerably broader terms than is reflected in the documents.

■ Fed.R.Civ.P. 52(a) provides that findings of fact by the district court shall not be set aside unless they are clearly erroneous. See *Alexander v. Youngstown Board of Education,* 675 F.2d 787, 795–796 (6th Cir.1982). In our rejection of the fact findings of the district court we have followed that standard. As to the interpretation and construction of the subcontract, the clearly erroneous rule does not apply. See e.g., *Industrial Equipment Co. v. Emerson Elec. Co.,* 554 F.2d 276, 284 (6th Cir.1977) ("The decision on the existence of a contract and the decision on the construction of a contract are both ultimate questions of law."); *Taylor & Gaskin, Inc. v. Chris-Craft Industries,* 732 F.2d 1273, 1277 (conclusion of law are subject to *de novo* review); *Cordovan Associates v. Dayton Rubber Co.,* 290 F.2d 858, 860 (6th Cir.1961).

### A.

Early in 1974 the District invited bids for improvements to the Plant in the form of a proposal and form of contract. Contract 3A covered general construction and contained forty-four separate items of work. Item 21—Mixed Liquor Pumping Equip-

---

1. The contract with the District was signed by E.C.I. The documents exchanged between the parties which constitute the subcontract were usually addressed by Worthington to E.C.I. or Dugan & Meyers while the documents addressed to Worthington were on Dugan & Meyers' stationary or forms. The district court dis-

tinguished the joint venture from either E.C.I. or Dugan & Meyers or Goettle as a contracting party. Because of the varied manner in which the documents were addressed and signed, we find such distinction unwarranted. See also the discussion at p. 1174 *infra.*

ment—covered the particular system, including equipment, necessary to pump effluents from aeration tanks to final settling tanks. This item had twenty-one detailed parts or specifications. The form of proposal described the work for Item 21 as follows:

> The Contractor shall furnish and install at the locations shown on the drawings or as required, a complete mixed liquor pumping installation consisting of eight (8) horizontal, centrifugal, mixed flow type pumps, driven by variable speed, wound rotor motors. Drivers and pumps shall be direct connected through flexible couplings and mounted on a common bedplate. Included also is the complete control installation. Two complete systems will be furnished, one for each bank (east and west) of pumps, each bank consisting of four (4) pumps.

> The above is a general description of the equipment required, however, the intent of this specification is to require an installation complete in every detail. Consequently, the Contractor will be responsible for all accessories, appurtenances and any special construction which may be necessary to properly complete the work of this Item. The price bid under this item shall include the cost of all materials and labor required.

More specifically Item 21 included, in addition to the pumps, motors and control installation, work under other items such as concrete foundations, motor starter equipment, flow meters, piping and an overall electrical link up.

The form of proposal generally required each bidder to schedule the name of the manufacturer of the equipment proposed to be furnished together with certain additional essential information regarding such equipment. These "major equipment offerings", as they were called, provided that if the manufacturer or supplier was not one of those named in the specifications the bidder was required to furnish additional data. As to Item 21, the bidder was also required to list as a second manufacturer one of the manufacturers named in the specifications "together with the total lump sum amount ... to be added to or deducted ... from the [bid] if the District select[ed] the equipment of that manufacturer". Worthington was one of the manufacturers of pumps named in the specifications. As is customary, several manufacturers of pump equipment made proposals to likely bidders offering their equipment for inclusion in the bids. Worthington was one of the pump manufacturers making such a proposal.

On May 15, 1974, Worthington addressed a form letter to Dugan & Meyers offering to provide equipment for certain specific parts of Item 21. Presumably, Goettle received the same letter. On May 17, 1974, Worthington addressed form letters to Goettle and Dugan & Meyers following up the letter of May 15, 1974. The May 15, 1974 letter referred to "our quote CLV–129–74E–FL" and described the specific parts of Item 21 Worthington offered to provide [2] as well as parts of Item 29, the service water pumps, which Worthington was willing to provide. Neither letter contained a price. The first letter had attached the Worthington Standard Conditions of Sale which included terms of payment, 10% with purchase order, 80% over the time of manufacturer and 10% upon completion of erection and testing, and a warranty "for a period of one year from the date of shipment ... against defects in material and workmanship, under normal use and service ...." as well as the following statement:

> "This is Worthington's sole and exclusive warranty [and] applies only to equipment manufactured by Worthington."

The May 17 letter included detailed information on the pumps being offered, terms

---

**2.** Worthington limited itself to furnishing Shop Testing (21.06), Mixed Liquor Pumps (21.08), Conditions of Service (21.09), Pump Construction (21.10), Motors (21.11), Panel Automatic Control System (21.12), Motor Control Centers (21.13), Local Control Panels (21.14), Spare Parts (21.19), Safety Guards (21.21) and Additional Services (21.22). The additional services consisted of adjusting and testing the equipment after installation.

of payment of 90% on delivery and 10% on acceptance, not to exceed 180 days from shipment, and extended the warranty "to include one year from acceptance not to exceed 18 months from shipment".

Worthington's proposal in its letter of May 15, 1974 did not include all of the parts or specifications described in Item 21; Worthington did not propose to install the complete mixed liquor pumping system. Specifically, Worthington did not obligate itself to furnish Detailed Drawings (21.02), Work Under Other Items (21.07),[3] Electrical Installation (21.15), Anchor Bolts And Installation (21.16), Piping And Valves (21.17) and Painting (21.10). The Worthington warranty was substantially the same warranty as contained in the proposals of other pump manufacturers.[4]

E.C.I. was the successful bidder on Contract 3A. On August 28, 1974 it signed a contract with the District and posted a twenty-two million dollar performance bond. The bid which was incorporated into the contract with the District listed Morris Pumps, Inc. as the pump manufacturer under Item 21 and did not list a manufacturer named in the specifications as an alternate manufacturer.

Two days earlier, on August 26, 1974, Worthington wrote

"E.C.I.

Duggan & Meyers/Richard Goettle, Inc."

a letter which stated that the writer was confirming the data he gave "Larry Rayburn verbally on August 23, 1974" as to the lump sum price of $570,250 for the equipment it offered under Item 21 and Item 29. The letter made specific reference to "our Proposal CLV129–74E–PL" and to the particular parts of Items 21 and 29 described in the May 15, 1974 letter. A "December 1975 delivery" was based upon receipt of a verbal purchase order by August 28, 1974. This letter also included as an attachment a bid to Worthington for the control panel (Autocon) and stated the lump sum price was based on using "Continental Electric Motors".

As will be seen from the review of the testimony, this offer by Worthington was prompted by the fact that the information provided by E.C.I. on the Morris Pumps was insufficient for the District to make a determination that their pumps were acceptable under the specifications. The testimony also established that Worthington was given a verbal go-ahead on August 28, 1974.

On September 3, 1974 the District was asked to approve the substitution of the Worthington pumps for the Morris pumps. Also, on September 3, 1974 Engineering Construction, Inc. wrote Worthington that it requested the District to approve the change to Worthington pumps and that "upon approval of this change ... we will purchase this equipment from Worthington pump in accordance with your latest quotation dated August 26, 1974".[5] On September 4, 1974 the District sent E.C.I. a copy of the executed contract and a Notice to Proceed. On September 27, 1974 the consulting engineers to the District approved the change from the Morris pumps to the Worthington pumps for Item 21.

On October 2, 1974 Worthington sent

"E.C.I.

Duggan & Meyers"

a printed form of acceptance for eight mixed liquor pumps complete with motors and controls for a price of $527,457. It was not received until October 14, 1974. The form stated the terms of payment as 90% upon delivery and 10% upon acceptance not to exceed 180 days from shipment and included 10 days of Worthington service. Under the heading "our quotation No." it referenced "CLV–129–74" and un-

---

**3.** "[T]he 5KV full voltage motor starter equipment and all connecting wiring between the motor control center and the manual control panel".

**4.** These included Allis-Chalmers Corporation, DeLaval Turbine, Inc. and Morris Pumps, Inc.

**5.** Engineering Construction, Inc. is not identified in the record. From the letterhead it appears to be a wholly owned subsidiary of Dugan & Meyers.

der "Date" on the same line it referenced "5/17–5/21 & 8/26/74". Following the words "Cust. Order No." on the front were the words "Letter Intent". The printed backside of the form contained Worthington's limited warranty as previously described.

On October 8, 1974 Dugan & Meyers sent Worthington a purchase order on a Dugan & Meyers' order form for "Pumps for Item 21 & 29, as per your quote and Plans & Specifications" for a lot price of $570,250. The purchase order form was dated August 28, 1974.[6] On November 8, 1974 Dugan & Meyers wrote Worthington confirming a telephone conversation in which its purchase order was amended to delete the pumps under Item 29, changing the total purchase price to $527,457 and adding to the terms of payment "no retainage". Worthington acknowledged the alimination of the retainage. The previous references to Item 29 are in Worthington's letters of May 15, 1974 and August 26, 1974. There is no reference to Item 21 in Worthington's acceptance of October 2, 1974. The previous references to retainage are in Worthington's letters of May 15, 1974 and May 17, 1974 and particularly in its acknowledgement of October 2, 1974. Terms of payment are not mentioned in Worthington's letter of August 26, 1974 or in the Dugan & Meyers' purchase order. Lastly, the change in the total purchase price to $527,457 with the elimination of the Item 29 pumps, is consistent with the price stated in Worthington's acknowledgement of October 2, 1974. The Dugan & Meyers' purchase order did not separately state a price for Item 21 and Item 29.

The motors were separately delivered, after the pumps were shipped, on various dates between July 16, 1976 and September 30, 1976 so that the eighteen month period of Worthington's limited warranty expired on March 31, 1978.

**B.**

The testimony describing discussions on the subcontract was rather meager, confirming the district court's view that "the parties did not intend to reach a binding oral agreement as to the terms of the contract". Lawrence Rayburn (Rayburn) a vice-president of Goettle testified that the warranty was critical to the plaintiffs but that he had no recollection of ever discussing it with Worthington. He testified that the verbal purchase order was given to Worthington on August 28, 1974. In a proffer regarding Rayburn's testimony, Worthington said he would also testify that Worthington's initial proposal included Westinghouse motors and controls at an overall price of $659,833, that plaintiffs requested Worthington to substitute Continental motors and Autocron controls at a reduced price when the Morris pumps were determined to be unacceptable, that Worthington did reduce the price by some $89,000 and that this reduction enabled plaintiffs to obtain the contract with the District.

George Cramer (Cramer), the first project manager for Dugan & Meyers, testified that he coordinated and obtained the bids of the subcontractors for the mechanical work, that Rayburn worked with him, that "we received a revised proposal from Worthington's pump" sometime in August and that he sent the letter of September 3, 1974 from Engineering Construction, Inc. to Worthington. He recalled at least one meeting with Worthington and described the discussions at the meeting regarding the warranty as follows:

Q. What was the nature of your discussions with those representatives of Worthington?

**6.** The backdating of the purchase order to conform to the date of the oral purchase order is of some moment because the district judge in large part premised his finding that the parties never agreed to Worthington's limited warranty on the fact that the purchase order was actually prepared on August 28, 1974 and was "appropriately [to be] considered an offer to purchase the mixed liquor pumps and related equipment required under Item 21 of Contract 3A." In our view the parties were already obligated to each other by the time the purchase order was sent and therefore it plays no role in determining whether the limited warranty was part of the Worthington subcontract.

A. ... they were quite interested in selling the pumps to the joint venture and we were trying to iron out any problems with their proposal versus what was needed to fulfill the contractual obligations to the city.

Q. Were there any particular concerns with respect to their proposal which were discussed?

A. The warranty of the—period of time of the warranty.

Q. Do you recall what was discussed with respect to the period of time of the warranty?

A. That, really, their warranty did not meet the plans and specifications which called for—which called for them to provide certain guarantees and warranties per the plans and specifications, and we wanted to make sure that their warranties would meet those that we had to give to the city.

Cramer testified as to receipt of Worthington's letter of August 26, 1974, but did not mention the verbal purchase order of August 28, 1974. Lastly, Cramer acknowledged that the letter of August 26, 1974 made no mention of warranty one way or the other.

Frederick Slack (Slack), the Dugan & Meyer's project manager who followed Cramer, testified that he went to work in September 1974, that he prepared the purchase order dated August 28, 1974 which he sent on October 4, 1974 and that the acknowledgement by Worthington was received by Dugan & Meyers on October 14, 1974. Slack also testified as to his unsuccessful effort to obtain a signature from Worthington acknowledging receipt of the purchase order.[7]

Carroll Robertson (Robertson), who handled the subcontract for Worthington, testified that he had no recollection of any discussion regarding warranties and also that he did not recall Rayburn insisting that the Worthington warranty be co-extensive with the warranty in the prime contract running to the District. He further testified that when Worthington wrote prospective bidders on May 15, 1974 it had not decided who would supply the motors and control panels and that on the morning of the bid openings Worthington gave its final price to the bidders and advised them Worthington was going to use Westinghouse motors and controls. Robertson's testimony corroborated the proffer on Rayburn that the change to Continental motors and Autocron controls was made at plaintiffs' request in an effort to reduce Worthington's price.

Lawrence Papes (Papes), an employee of the District who drafted Item 21 for the design engineers, testified that Item 21 described the level of performance that had to be met by the system installed with the actual selection of particular equipment left to the contractor.

**C.**

**1.**

■ The district court filed detailed findings of fact and conclusions of law as required by Fed.R.Civ.P. 52. We have reviewed the findings and conclusions in light of the record as a whole. A finding is "clearly erroneous" when, although there is evidence to support it, a reviewing court is left with the definite and firm conviction that mistake has been made. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), *rehearing denied* 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147; *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct.

---

**7.** The effort to obtain a formal acknowledgement from Worthington is reflected in two documents. The first is a letter by Slack to Worthington and the second is Worthington's response on March 4, 1975 saying that it was not Worthington's custom to sign a customer purchase order and that Worthington confines its acceptances only to the terms and conditions of its Standard Acknowledgement Form. The district judge found this exchange of correspondence of some significance in arriving at his conclusion. Like our disregard of the Dugan & Meyers' purchase order we find this correspondence not relevant to a determination of the agreement of the parties. See footnote 6, *supra.*

1190, 1199, 4 L.Ed.2d 1218 (1960). Based on the entire record, we are left with the firm conviction that a mistake has been made in this case in the conclusion that Worthington's limited warranty terms were not part of its subcontract.

### 2.

The district court found that the joint venture reviewed various equipment proposals including Worthington's and, after negotiating with various pump manufacturers, elected to purchase the pump equipment from Worthington. This of course is not true. Plaintiffs initially chose to use the Morris pumps and only at the last minute when they found out Morris' pumps were not acceptable to the District did they switch to Worthington. When plaintiff's switched, they asked Worthington to change to Continental motors and Autocron controls in an effort to reduce the overall price.

The district court found that Cramer, in his discussion with Robertson, advised Robertson that "plaintiff would require all equipment suppliers to be bound by the warranty to the City contained in Contract 3A." The evidence does not support this characterization of Cramer's testimony.[8] At most Cramer indicated a desire to have Worthington's warranty meet the warranty to the District in the prime contract; there is no evidence that he ever followed through. We note that Cramer left the project in September before the District approved the changeover to Worthington pumps.

The district court found that the Dugan & Meyers' purchase order which was sent on October 8, 1974, was prepared on August 28, 1974. Again, the evidence does not support this finding. The purchase order was prepared by Slack who did not start working on the project until September. Even if it were proved the purchase order had been prepared on August 28, 1974, that fact would be of no relevance since it was not sent to Worthington until October 8, 1974.

The district court found that the purchase order, dated August 28, 1974, was appropriately to be considered an offer to purchase. By October 8, 1974, however, the date the purchase order was sent, E.C.I. had signed the prime contract with the District and had been given a Notice to Proceed. By September 30, 1974, moreover, Dugan & Meyers had orally accepted Worthington's revised proposal, acknowledged its acceptance in writing and received formal approval from the District of the change from Morris to Worthington pumps. Also, on October 2, 1974 Worthington had formally acknowledged receipt of a purchase order from Dugan & Meyers.[9] We, therefore, find that the district court erred in finding that the purchase order dated August 28 was properly characterized as an offer to purchase.

The district court found that Worthington's argument that the three Worthington letters of May 15, 1974, May 17, 1974 and August 26, 1974 constituted an offer to the "joint venture [could] not be sustained" because the "joint venture never entered into negotiations with Worthington until substantially after the time in which any offer contained thereon lapsed." This finding is clearly erroneous for a number of reasons. First, the May 15, 1974 and May 17, 1974 letters describe precisely the items Worthington proposed to provide. The August 26, 1974 letter contains the same quote number as the May 15, 1974 letter and the August 26, 1974 letter was acknowledged to be a "revised proposal". Second, the acknowledgement by Worthington on October 2, 1974 references the quote number and prior letters as well as the terms of payment first described in the May 15, 1974 letter. The basic data re-

---

8. The district court also was in error in finding that Rayburn testified that "defendant orally agreed to be bound by the warranty to the City". Rayburn had no recollection of ever discussing the warranty with Worthington.

9. The delay between the date of the formal acknowledgement of October 2, 1974 and Dugan & Meyers' receipt on October 14, 1974 is not explained.

garding the specifications and performance of the Worthington pumps which the successful bidder was required to pass on to the District is contained in the May 17, 1974 letter. Further, there was no lapse in the Worthington offer which was received when the joint venture entered the negotiations. Even before the prime contract was awarded and the change to Worthington pumps approved, Worthington was obligated to furnish the pumps, motors and control equipment. See *United States v. McShain*, 258 F.2d 422 (D.C.Cir.1958); Restatement (Second) of Contracts § 87 comment e, illustration 6. Lastly, the suggestion that somehow the joint venture was a new party on the scene was clearly incorrect. Dugan & Meyers through E.C.I., its wholly owned subsidiary, bid contract 3A and was awarded Contract 3A. Dugan & Meyers, for the most part, conducted all the negotiations with Worthington.

The district court found that because Worthington included in the acknowledgement of October 2, 1974 additional or different warranty terms from those contained in the purchase order of August 28, 1974, Worthington could not require plaintiffs to object to such additional terms. This tying of the acknowledgement of October 2, 1974 to the purchase order was improper since, as we have previously described, by the time the purchase order was prepared the parties had entered into the subcontract.

The district court's ultimate finding that the parties never agreed on the Worthington warranty, as reinforced by the exchange of correspondence regarding Worthington's failure to sign the purchase order, was also clearly erroneous. There is just nothing in the correspondence or in the testimony to even suggest that Slack's desire to have Worthington sign the Dugan & Meyers' purchase order was anything more than a formality to complete his file.

**3.**

Based on its findings, the district court concluded that the parties never came to an agreement on Worthington's express warranty. This conclusion was the same, the district court said, whether the Worthington letter of August 26, 1974 or the purchase order dated August 28, 1974 was the starting point of the negotiations. According to the district court, if the August 26, 1974 proposal was the offer which plaintiffs subsequently accepted, there was no express warranty because this letter included no mention of a warranty. If the purchase order was the starting point, again there was no express warranty because Worthington's acknowledgement under Ohio Rev.Code § 1302.10(A) (U.C.C. 2-207) was an acceptance without regard to inclusion of the warranty provisions on the reverse side. Under the circumstances as found by the district court absent an agreement on a warranty, "resort to the Code to furnish the applicable warranties does not interfere unfairly with the legitimate expectation of the parties".

The evidence seems clear, however, that the award of the contract to the joint venture could not have been made without consideration and approval by the District of Worthington's letter proposals of May 15, 1974 and May 17, 1974, since the forms of proposal required a detailed submission of certain data which was outlined in these letters. Clearly, these letters together with the letter of August 26, 1974 constituted Worthington's offer to furnish the pumps, motors and control panels. The offer remained irrevocable until E.C.I. had a reasonable opportunity to notify Worthington of the award by the District and its acceptance of Worthington's offer. See Restatement (Second) of Contracts, *supra*. E.C.I.'s notification of the award to Worthington constituted acceptance of Worthington's offer and of Worthington's express limited warranty as stated in the May 15, 1974 letter. The fact that Worthington's warranty terms conflicted with the warranty in the general contract with the District is of no significance since a subcontractor is free to contract in any manner it desires and, in case of conflict, the terms of the subcontract prevail. *John W. Johnson, Inc. v. Basic Construction Co.*, 429 F.2d 764 (D.C.Cir.1970); *McKinney Drilling Co.*

*v. The Collins Co.*, 517 F.Supp. 320 (N.D. Ala.1981). The parties in fact agreed on Worthington's limited warranty. It was neither necessary nor appropriate to resort to the Code. See Squillante, *Warranty Sales Law in Ohio*, 31 Case W.Res. 211, 213 (1981); *Inglis v. American Motors Corp.*, 3 Ohio St.2d 132, 209 N.E.2d 583 (1965).

## III.

■ Alternatively, we find that the district court erred in concluding that Worthington breached an implied warranty of merchantability and fitness for a particular purpose, Ohio Rev.Code § 1302.27 (U.C.C. § 2–314) and Ohio Rev.Code § 1302.28 (U.C.C. § 2–315). In so doing we do not take issue with the basic finding of the district court that the mixed liquor pumping system did not properly perform and that the immediate cause of its malfunctioning was the failure of the pumps to properly operate. The district court's conclusion on imposing implied warranty liability depended on the conclusion that plaintiffs relied upon the skill and expertise of Worthington in the choice of motors. The district court's conclusion was also based on its rationale concerning the scope of the work undertaken by Worthington. Assuming Worthington was obligated under an implied warranty as to its work based on these conclusions, absent a finding that the equipment delivered by Worthington did not meet the specifications or that there were defects in the equipment at the time it was delivered, Worthington is not liable. *McDonald v. Ford Motor Co.*, 42 Ohio St.2d 8, 326 N.E.2d 252 (1975).

As to what actually happened at the Plant there is no disagreement. The pumps were tested and approved at a Worthington facility in January and March 1976. The last of the motors was shipped on September 30, 1976. The mixed liquor pumping system was first tested in July 1977. The Plant began operating in the Spring of 1978. The first trouble with the mixed liquor pumping system began with pumps 6 and 8 in June 1978. Additional

difficulties with the motors were encountered in August 1978. Lastly, the mixed liquor pumping system has never worked satisfactorily as a whole. However, the district court did not make an express finding on the cause of the failure of the motors and there is nothing in the record which indicates whether the failure of the motors to operate properly was caused by a defect in their manufacture or as a result of the way the system is operated.

## A.

■ The test for finding an implied warranty of fitness for a particular purpose has been described as follows:

> First, the seller must be aware at the time of contracting of a particular purpose for which the buyer intends to use the goods. Second, the buyer must rely on the seller's skill or judgment to select or furnish goods suitable for that particular purpose. Ohio Rev.Code Ann. § 1302.28 ....

*Price Brothers Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 423 (6th Cir.1981).

The district court found that Item 21 essentially provided for a performance specification and that in selecting Worthington "plaintiff ... relied on Worthington's expertise as a manufacturer of pumps to select a system of pumps, motors and controls which would meet this performance specification". This finding was incorrect. Worthington was specifically asked to use Continental motors and Autocron controls to reduce its price; Worthington had initially proposed to use Westinghouse motors and controls. The district court was also clearly erroneous when it concluded that:

> The joint venture contracted with Worthington, the manufacturer of the major component pumps to supply a system which would meet the performance specification of the general contract. Plaintiff relied upon defendants' expertise in selecting the appropriate systems and Worthington was aware of that reliance.

Had this been the parties' actual intention it would have been a simple matter for

Worthington to have proposed to be responsible for Item 21 in its entirety rather than the discrete parts described in its May 15, 1974 and August 26, 1974 letters.

In *Price Brothers, supra,* we held that the trial court's conclusion that the defendant breached an implied warranty of fitness for a particular purpose was clearly erroneous because of the degree of specificity in the buyer's purchase order and the buyer's own undisputed expertise. Here, the trial court's finding that plaintiffs relied on Worthington's superior expertise cannot be sustained since regardless of whether or not Worthington possessed greater expertise than plaintiffs, Worthington did not choose all of the equipment covered by the subcontract.

### B.

Worthington never undertook to provide the complete mixed liquor pumping system as described in Item 21, but instead confined its obligation to specific parts which did not include among other things, the piping and electrical wiring.[10]

The district court found as we have described that the mixed liquor pumping system failed to perform in the manner intended. In making this finding, the court also found that all of the component parts were supplied by Worthington. While it is true that the pump system failed to perform in the manner intended, it is not correct that "all" of "the component parts" were "supplied" by Worthington. As above described, Worthington had no responsibility for components of the system which others,

including the contractor, were obligated to furnish. A failure of the system to operate properly does not by itself mean that equipment supplied by Worthington, which constituted but a part of the mixed liquor pumping system, was defective.

### C.

The implied warranty of merchantability is breached when goods are not of an acceptable quality when compared to that generally acceptable in the trade for goods of the kind. Ohio Rev.Code Ann. § 1302.-27; *Price Brothers, supra* at 424. As noted above, there was no evidence that the particular equipment furnished by Worthington did not meet specifications. Nor was evidence introduced to show the existence of any defect in the equipment at the time it was delivered.

Under Ohio law, the plaintiff in a breach of warranty case carries the burden of proving that a defect exists in the product manufactured and sold by the defendant, and that the defect existed at the time the product left the defendant's control. *McDonald v. Ford Motor Co., supra.*[11] The fact that the mixed liquor pumping system failed to work properly does not by itself link any specific defect to Worthington. Nor does it provide any basis for finding that any component part supplied by Worthington was defective when delivered.

The cases relied on by plaintiffs are not to the contrary. In *Edwards-Warren Tire Co. v. J.J. Blazer Construction Co.,* 565 F.2d 401 (6th Cir.1977), we upheld a jury award in favor of an Ohio buyer of a

---

**10.** See footnote 2, *supra.*

**11.** This is the general rule. The official commentary (Purposes of Changes ¶ 13) to Uniform Commercial Code Section 2–314 reads in part:

> In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained.

Thus, it is generally held that in order to prevail in an action for breach of the implied warranty of merchantability, the plaintiff must prove that the seller sold goods which were not merchantable at the time of delivery. See e.g. *Bilotta v.*

*Kelley Co.,* 346 N.W.2d 616 (Minn.1984); *Falker v. Chrysler Corp.,* 119 Misc.2d 375, 463 N.Y.S.2d 357 (1983); *F & S Offshore, Inc. v. Service Machine & Shipbuilding Corp.,* 430 So.2d 1167 (La. Ct.App.1983); *Alfa Romeo, Inc. v. S.S. "Torinia",* 499 F.Supp. 1272 (S.D.N.Y.1980); *Jensen v. American Motors Corp.,* 437 A.2d 242 (Md.1981). While the plaintiff can establish that the goods were not merchantable by showing direct evidence of a specific defect or through circumstantial evidence, the plaintiff shoulders the burden of producing substantial evidence that the injury and damages were caused proximately and in fact by the defective nature of the goods.

quantity of earth-mover tires on the ground the seller had breached an implied warranty of merchantability. In addressing the seller's assertion that the buyer failed to make out a *prima facie* case that the tires were defective at point of purchase, we said:

> From the eyewitness accounts of Blazer's "tireman", Herb Azbell, a man with seven and one-half years of tire maintenance experience, the jury could rationally deduce that the structural disintegration of a majority of the tires, after short periods of service under normal operating conditions, was caused by latent defects attributable to the manufacturer .... It was then the manufacturer's option to present, as an affirmative defense, evidence of product misuse or other intervening cause.

565 F.2d at 404.

Similarly, in *Jetero Construction Co. v. South Memphis Lumber Co.*, 531 F.2d 1348 (6th Cir.1976), we held the trial court's conclusion that the seller failed to deliver goods which were of a quality called for by the sales contract was supported by physical evidence introduced at trial. In that case, the buyer, who "was not an expert on lumber grading", relied on the seller's expertise in ordering "60,000 '2' × '4' × '92⅝'' # 2 spruce studs". *Id.* at 1350. The first 16,000 studs delivered by the seller had painted red ends like those in the sample shown to the buyer. The remaining shipments contained studs with either green or unpainted ends and "did not appear to be of as high a quality as the earlier shipments". *Id.* In affirming the district court we said:

> The District Court ... had before it the testimony of Luther Johnson, a Georgia lumber supplier, that # 2 grade studs would not have warped, bowed and discolored to the extent that the SML green end and unpainted studs did. The District Court also was able to examine Exhibit 3, a discolored stud submitted as an example of the studs at issue. The stud bore the grade mark "stud" and had no markings indicating that it was of number two quality or equivalent. This evidence and testimony provides a substantial basis for the District Court's finding. (footnotes omitted)

531 F.2d at 1354 (footnote omitted).

Here, Worthington was not required to show conclusively that the pump failures resulted from some cause other than a defect or defects in the component parts supplied by Worthington. Instead, the burden in the first instance was on plaintiffs to show the existence of a defect in the equipment supplied by Worthington at the time of delivery. In light of plaintiffs complete failure to introduce evidence that the equipment supplied by Worthington did not meet plaintiffs' specifications or was in some way defective, Worthington was not shown to have breached an implied warranty of merchantability.

## IV. Conclusion

Worthington's limited warranty terms were a part of the subcontract. There was no basis for resorting to the Code to supply any warranties, particularly an implied warranty of merchantability and fitness for a particular purpose. Even if it was proper to imply a warranty of merchantability and fitness for a particular purpose in the subcontract between plaintiffs and Worthington, plaintiffs failed to carry their burden in establishing a breach of the subcontract. There was no evidence to show either that Worthington supplied all of the equipment or that the equipment Worthington did supply did not meet plaintiffs' specifications or was defective at the time it was delivered.

The judgment of the district court is REVERSED.

CONTIE, Circuit Judge, concurring.

I concur in Parts I and II of the majority opinion. Since our holding that the implied warranties were disclaimed properly disposes of this case, I do not reach the issues discussed in Part III of the majority opinion.

The majority apparently construes Worthington's May 1974 letters as a viable offer even after the joint venture entered

the picture in late June or early July. App. at 116. However, because Worthington specified that the May offer remained open only for 30 days, the offer lapsed prior to formation of the joint venture. App. at 473.[1] Worthington's letter of August 26 referred to "Our Proposal CLV–129–74E–PL," thereby incorporating the disclaimer of implied warranties.[2] I agree with the majority that the offer was accepted by the joint venture through a verbal purchase order on August 28. This offer and acceptance, including the warranty disclaimer, constituted the contract.

The implied warranty of merchantability may be excluded by a conspicuous disclaimer which mentions merchantability; the implied warranty of fitness may be excluded by a conspicuous written disclaimer. Ohio Rev.Code § 1302.29(B). Since the written disclaimer mentions merchantability, only the disclaimer's conspicuousness is addressed. The question of conspicuousness is one of law which this court may consider *de novo. Delhomme Industries, Inc. v. Houston Beechcraft,* 669 F.2d 1049, 1061 (5th Cir.1982). Ohio Rev.Code § 1301.01(J) provides:

> "Conspicuous": A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON–NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous." Whether a term or clause is "conspicuous" or not is for decision by the court.

The disclaimer was clearly conspicuous in the May documents because it was printed in all capital letters, thereby contrasting with the remainder of the document. Whether incorporation of the disclaimer by reference in the August letter satisfied the requirement of conspicuousness requires consideration of the bargaining strength and commercial sophistication of the parties and whether the party attempting to avoid the disclaimer had actual knowledge of the disclaimer at the time of the transaction. *AMF, Inc. v. Computer Automation, Inc.,* 573 F.Supp. 924, 929 (S.D.Ohio 1983) (applying California law). Under Ohio law, a disclaimer has been found conspicuous when the buyer, a commercial entity, had actual knowledge of the disclaimer which was common in the industry. *Marion Audiovisual, Etc. v. Eastman Kodak Co.,* 487 F.Supp. 371, 374–75 (N.D.Ohio 1980); *FMC Finance Corp. v. Murphee,* 632 F.2d 413, 419 (5th Cir.1980); *Office Supply Co., Inc. v. Basic Form Corporation,* 538 F.Supp. 776, 784–86 (E.D.Wis. 1982); *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.,* 428 F.Supp. 364, 372 (E.D.Mich.1977).

The testimony indicated that the joint venture was a sophisticated business entity, whose participants had built several major sewage treatment plants in Kentucky, Ohio and Indiana. App. at 104. The testimony of Lawrence Rayburn of the Goettle Co. and George Cramer of Dugan & Meyers established that the joint venture was aware of the warranty provisions in Worthington's May letter (App. at 118, 138) and that such a warranty was standard in the industry (App. at 131). Therefore, the disclaimer was conspicuous and barred appellees' warranty claims.

Accordingly, I concur with the majority that the judgment of the district court be reversed.

---

1. Even where there is a written agreement to hold an offer open, the period of irrevocability may not exceed three months. O.R.C. § 1302.-08.

2. The disclaimer stated:
WORTHINGTON MAKES NO OTHER WARRANTY OF ANY KIND WHATSOEVER, EX-PRESSED OR IMPLIED; AND ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED BY WORTHINGTON AND EXCLUDED FROM THESE TERMS OF SALE.